WALTER E. EDGE, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Edge v. Comm'r
Docket No. 5506-71. United States Tax Court T.C. Memo 1973-274; 1973 Tax Ct. Memo LEXIS 13; 32 T.C.M. (CCH) 1291; T.C.M. (RIA) 73274; December 12, 1973, Filed. Paul H. Briger, for the petitioner. Fred L. Baker, for the respondent. QUEALY
MEMORANDUM *14 FINDINGS OF FACT AND OPINION QUEALY, Judge: Respondent has determined deficiencies in income tax to be due from petitioner for the taxable years 1966, 1967, and 1968, in the amounts of $31,504.60, $20,656.77, and $11,971.16, respectively. The sole question for decision is 2 whether petitioner's operation of a beef cattle farm was a trade or business so as to entitle him to deduct the losses resulting therefrom during the taxable years 1966, 1967, and 1968. [1]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Walter E. Edge, Jr. (hereinafter referred to as "petitioner" or "Edge") is an individual whose legal residence at the time of the filing of the petition herein was in Miccosukee, Leon County, Florida. Federal income tax returns for the taxable years 1966, 1967, and 1968, prepared on *15 the cash receipts and disbursements method, were duly filed with the district director of internal revenue, Newark, New Jersey. 3 During each of the taxable years in issue, petitioner owned, operated, and resided at Landfall Farm, which is located in Miccosukee, Leon County, Florida. Petitioner's residence has been exclusively at Landfall Farm since 1952, and he has maintained no other residence since that time. During the taxable years in issue, petitioner did not maintain a place of residence or actually reside in the State of New Jersey. Petitioner was influenced in his decision to locate his farm at its present site by his knowledge of the area from visits thereto in his youth, by its history as a farming region and its proximity to other beef cattle operations and cattle auctions, and by the fact that he had friends in the area. Since the organization of Landfall Farm, petitioner has been actively engaged in the day-to-day operation, supervision and management of the farm, which constituted his primary activity from the inception of the farm until he began liquidating the herds in 1970 and 1971. Petitioner personally designed the buildings on the farm, including *16 his residence, the barn, and the other farm structures, and was responsible for the general layout of the farm itself. 4 The principal enterprise of Landfall Farm was the production of Black Angus cattle for commercial beef purposes. Landfall Farm was not engaged in the production of purebred breeding stock. Crops were also raised for cattle feed and sale. During the years in issue, Landfall Farm comprised approximately 1,118 acres which were assembled by the petitioner through various purchases from 1953 through 1961 at an aggregate cost of $72,719.18. The average cost per acre was approximately $65. The following schedule sets forth the separate tracts acquired by the petitioner, the dates of each acquisition, and the purchase price paid for each tract: Acreage
Date Acquired
Purchase Price
1
206.92 acres
1/2/53
$10,346.00
2
5.13 acres
5/1/53
179.54
3
441.05 acres
5/1/53
28,342.40
4
252.91 acres
6/3/53
10,833.00
5
7.05 acres
10/26/53
564.00
6
4.00 acres
12/1/54
6,589.99
7
11.80 acres
2/3/55
1,000.00
8
18.04 acres
2/16/56
902.00
9
142.50 acres
2/22/57
11,493.50
10
11.55 acres
7/15/60
994.45
11
12.16 acres
3/15/61
974.30
12
1.50 acres
6/2/61
150.00
13
3.50acres
10/19/61
350.00
Total
1,118.11acres
$72,719.18
*17 5 The first two parcels, comprising 212.05 acres of land, were purchased by petitioner from his father. Except for parcel #7, all other acreage in Landfall Farm was acquired from unrelated third parties. Prior to purchase and assemblage by petitioner, the acreage comprising Landfall Farm had been used for the raising of cotton and had generally lain barren since that time. All of the tracts acquired by petitioner consisted of raw and unproductive land, lacking fencing, pasture, drainage, wells, access roads and buildings. Portions of the property were clear and others were wooded or scrub.Initially, petitioner was actively involved in reclaiming the land, clearing and bulldozing it, and laying out pastures for the animals. In 1953 and 1954, petitioner borrowed $90,000 from the Guaranty National Bank for use in the development of Landfall Farm. Early in the farm's development, due to problems encountered in fertilizing and improving the farm's 6 pastures during dry periods, [2] petitioner purchased an irrigation system capable of being moved from one pasture to another. The initial cost of the irrigation equipment was less than $5,000, however, the cost of operation *18 could run as high as $70 per week. The County Agricultural Agent for Leon County, Florida, generally did not recommend that farmers install an irrigation system because of its impracticability, potential under-utilization, and cost of operation. Petitioner disposed of the irrigation system prior to 1966. As of the years in issue, all but 75-80 acres of the farm had been improved into pasture land with irrigation, drainage, and shade for the cattle. Such 75-80 acres of non-pasture land comprised Lake Miccosukee (approximately 49 acres), Lake Lonnie (about 5 acres), petitioner's residence, farm structures, fences, and roads. 7 Petitioner's acquisition cost for the land was approximately $65 per acre. Had petitioner acquired improved, productive farmland during the years 1952 through 1961, he would have had to pay approximately $200 an acre. The basic land cost for Landfall Farm thus would have been approximately $200,000 *19 rather than the $72,000 that petitioner paid for it. At the time of the trial, the cost of land in the area of petitioner's farm, whether improved or unimproved, had risen to approximately $300 an acre due to urban sprawl, the growth of Leon County, and a general scarcity of land. Adequate fertilization of pasture land such as that located in Landfall Farm could be accomplished during the period 1966 to 1969 at an average annual cost of approximately $15 per acre. In years in which it was necessary to lime, usually every 5 to 7 years, fertilizer costs were higher. Petitioner's annual 8 fertilizer cost, total acreage and average cost per acre for each of the years since the inception of Landfall Farm were as follows: Year
Total Cost
Total Acreage * *21 Average Per Acre
1953
$ 8,224.90
833.06
$ 9.87
1954
--
837.06
--
1955
2,466.56
848.86
2.91
1956
6,624.73
866.90
7.64
1957
4,144.52
1,009.40 4.11
1958
5,169.32
1,009.40
5.12
1959
3,815.81
1,009.40
3.78
1960
5,143.56
1,020.95
5.04
1961
5,810.57
1,03 8.11
5.60
1962
6,416.27
1,038.11
6.18
1963
18,183.60
1,038.11
17.52
1964
16,055.17
1,038.11
15.47
1965
11,988 .56
1,038.11
11.55
1966
18,184.34
1,038.11
17.52
1967
27,548.20
1,038.11
26.54
1968
12,955.00
1,038.11
12.48 1969
25,973.00
1,038.11
25.02
1970
16,954.00
1,038.11
16.33
1971
19,710.00
1,038.11
18.99
1972
8,135.00
1,038.11
7.84
*20 16 By 1959, petitioner decided that the farm had reached a point where it would maintain a herd sufficiently large to being a commercial beef cattle operation. In mid-1959, petitioner purchased a herd of 119 Black Angus, part Angus and part Hereford cows and 3 Black I00005689008987Angus bulls at a cost of approximately $14,000. This herd was culled of all animals except those of true Black Angus stock. Petitioner received $5,681.43 for the culls. Petitioner chose to raise Black Angus cattle because he felt that they tended to calve easier and graze better in hot weather than other breeds. During the period 1960 through 1970, petitioner purchased bulls as follows: Year
Bulls Purchase
Purchase Price
1960
2
$ 1,000
1961
3
1,050
1962
2
600
1963
4
2,050
1965
4
2,600
1966
8
4,000
1967
1
500
1968
2
2,000
1969
2
1,200
1970
3
1,775 17 The herd purchased in mid-1959, as culled down to approximately 80 animals, constituted the original herd (except for bulls) from which all *22 of the farm's subsequent herds were developed. Since 1959, no other cattle have been purchased from outside sources except for bulls. The development of Landfall Farm's Black Angus herds has been entirely internal, built from its own heifers. Landfall Farm's cattle operations during the years in issue thus commenced in 1959. A farmer seeking to do so in the late 1950's could purchase a full-sized commercial herd, although he would run the risk of buying poor quality animals. However, the cost of acquiring a Black Angus herd of commercial size at that time would have been between $175 and $200 per head. Even at such costs, the herd would not constitute a uniformly high quality production herd which, if available at all, would cost as much as $262 per head. The substantial capital investment required and the unavailability of quality herds typically prompt cattle farmers to develop their herds internally, as was the case with petitioner. 18 Internal development tends to produce the strongest and most uniform herd. To atttempt to accelerate herd growth through outside purchases creates substantial risks of introducing disease or inferior conformation into a developing herd. *23 Uniform quality and high health standards are best accomplished through internal breeding and selective culling during the build-up stages. Petitioner's goal was that Landfall Farm would have six productive herds, each containing approximately 100 brood cows. Once petitioner's original herd as culled reached 100 brood cows, all new high quality heifers were placed in a second herd, physically separated from the first. This procedure was to be followed until the six herd goal was achieved. As of the end of 1968, the last of the years here in issue, petitioner had developed three such herds and was building his fourth. Petitioner's goal of 600 cows represented an expansion of seven and one-half times the number of the original 80-head Black Angus herd acquired in 1959. 19 At least 10 to 20 years would be required to achieve that goal with improved quality animals, assuming an 85 percent calf crop. The average calving percentage in Leon County is 70 percent to 75 percent.In exceptional cases, that percentage could reach 80 percent to 85 percent. The recommended stocking rate for farms in Leon County, Florida, was 2 to 3 acres per cow although this rate could be varied *24 depending upon the amount of supplemental feed available. Petitioner intended to be able to support one brood cow per acre. Prior to 1968 when 175 acres were released from the Soil Bank Program, petitioner's goal of 600 brood cows would result in a stocking rate of approximately 1.4 acres per cow. Subsequent to 1968, maintenance of a 600-head herd would result in a 1.78 acres per cow stocking rate. Petitioner's actual stocking rate for the years in issue was approximately 3 acres per cow. 20 Petitioner practiced year-round rather than seasonal breeding. At least three bulls were kept in each separate herd at all times and the animals were permitted to breed freely during the entire year. Consistent with recommended breeding practices, each bull was required to service no more than 30 to 35 cows and the bulls were rotated from herd to herd to avoid close inbreeding. During the initial development of a herd through internal breeding, inferior heifers must be culled to promote good conformation and increase the overall quality of the herd. Heifers enter the production herd approximately 24 months after birth. Once the full capacity of a particular herd is reached, in order *25 for the size of the herd to be maintained, a number of heifers equal to approximately 20 percent of the brood herd must enter the production herd. Petitioner sold no heifers at least until 1964. 21 Maintenance of a production herd also requires that barren cows be culled from the herd and sold. Barrenness, which can be detected visually by an experienced cattleman, was determined at Landfall Farm by Womack's observation. At one time, petitioner and Womack experimented with a system of ear-tagging suspected barren cows, which was found to be inadequate because the tags could be removed by the animals. Thereafter, petitioner found that visual inspection of the animals was the most satisfactory method for his particular operation. Both petitioner and his superintendent went through each separate herd on a daily basis either by foot, horseback, or truck to determine barrenness and to maintain a visual inventory of the herds. In addition, cows were checked for barrenness more closely about twice a year when they were run through chutes for various innoculations. 22 Although recommended by both the University of Florida and the County Agricultural Agent of Leon County, few *26 farmers, including petitioner, maintained individual production records on each cow in the herd. Petitioner prepared no written inventories of his cattle preparatory to their sale and maintained no running inventory of herd size, the number and age of heifers, or the number and composition of calves bred each year, preferring to rely on a daily visual count and inspection of his herds. The visual count is considered acceptable, though not the best method of keeping track of a production herd. Insofar as the quality of cattle produced was concerned, petitioner's program of internal herd development was highly successful. Landfall Farm earned a reputation for producing high quality beef cattle. Landfall Farm is located near four or five good cattle auction markets and a beef packing plant and petitioner customarily sold his cattle at those markets. 23 On several occasions Landfall Farm's cattle were solicited by the County Agricultural Agent for sale at the Leon County Cattle Sale. In addition, some purchasers preferred to avoid the uncertainties of the cattle auctions by coming to Landfall Farm to directly negotiate the purchase of petitioner's cattle. This sales method, *27 in addition to saving the cost of transporting the cattle to auction, brought higher prices for the cattle sold. Prior to 1960, cattle prices tended to rise and fall in fairly well defined cycles. Beef prices were high in 1940 and again in 1950 to 1951. However, the expected high prices of the early 1960's never materialized and during 1966, 1967 and 1968, the price ranged from a low of $ .18 to a high of $ .28 per pound. Some of petitioner's culled older cows were sold during the years in issue at prices up to $250 per head. Cattle prices started an upward rise in 1970 and, at the time of the trial, had for the first time risen back to the 1951 price levels. In 1972, the average price had reached $ .54 per pound. 24 Cattle sales by Landfall Farm as reflected in petitioner's books and records for the years 1959 to 1972, inclusive, were as follows: Classification *
Cattle
Calves
Cows
Bulls
Heifers
Steers
Total
Amount Realized
1959
1
53
1
55
$ 5,681.43
1960
1
3
1
27
32
4,256.72
1961
1
43
44
6,119.02
1962
1
75
76
10,379.41 1963
1
33
78
112
11,635.73
1964
114
114
1965
74
18
4
45
70
211
21,085.85
1966
4
6
2
17
164
193
22,545.32
1967
[4] 184
4
1
132
111
432
49,074.15
1968
9
133
258
400
46,879.00
1969
22
111
136
269
29,802.00
1970
3
19
164
156
342
81,752.25
1971
[5] 306
1
3
113
118
541
81,009.00
1972
519
1
520
88,823.00
*28 25 Commencing with the years 1970 and 1971, petitioner began liquidating his cattle operations by selling portions of his brood herd. By the early part of 1973, petitioner's herd had been reduced to a few purebred Charolais bulls. Those bulls had been purchased subsequent to the years in issue to be crossbred with petitioner's Black Angus brood cows in an attempt to produce heavier calves. The farm actually produced some of these crossbred animals which were sold at wieghts ranging from 500 to 700 pounds. Since inception of Landfall Farm in 1952, income, expenses, gains and losses of the operation were as follows: Year
Income
Expenses
Net Gain or (Loss)
1953
$ 3,338.67
$27,433.20
($24,094.53)
1954
2,435.23
59,155.73
( 56,720.50)
1955
1,576.43
59,688.32
( 58,111.89)
1956
5,199.98
50,704.97
( 45,504.99)
1957
4,344.98
53,751.18
( 49,406.20)
1958
19,611.17
62,623.35
( 43,012.18)
1959
13,976.22
52,310.37
( 38,334.15)
1960
7,887.09
53,533.71
( 45,646.62)
1961
14,892.61
58,803.21
( 43,910.60)
1962
13,864.51
62,851.80
( 48,987.29)
1963
19,617.62
78,858.51
( 59,290.89)
1964
$ 15,243.11
76,416.63
($61,173.52)
1965
25,452.25
92,424.41
[6] ( 67,752.16)
1966
28,174.04
76,409.33$ ( 48,235.29)
1967
59,043.26
98,395.88
( 37,352.62)
1968
55,811.00
74,711.00
( 18,900.00)
1969
38,130.00
95,239.00
( 57,109.00)
1970
59,829.00
83,436.00
( 23,607.00)
1971
98,788.00
83,360.07
[7] 15,428.88
1972
101,379.00
69,765.00
31,614.00
*29 26 The depreciation deductions claimed for Landfall Farm from 1955 through 1971 were as follows: Year
Depreciation Claimed
1955
$ 8,496.82
1956
14,141.71
1957
14,141.71
1958
12,598.90
1959
12,160.25
1960
11,014.44
1961
11,990.63
1962
13,672.00
1963
15 ,799.70
1964
18,616.19
1965
16,989.96
1966
17,200.40
1967
17,210.48
1968
16,381.00
1969
18,513.00
1970
17,513.00
1971
16,459.00 27 Throughout the years in which petitioner operated Landfall Farm, he received substantial taxable income from dividends and other investments unrelated to the farm. The principal source of such income was from the successful management and reinvestment of an inheritance received by petitioner at birth. For the years 1966, 1967, and 1968, petitioner's adjusted gross income, including capital gains, but exclusive of claimed farm losses, was as follows: Year
Adjusted Gross Income
1966
$84,033
1967
83,903
1968
89,450
Petitioner did not expect to realize a profit in the *30 years 1966, 1967, and 1968. In fact, he would have been highly gratified had his farming operation merely broken even. Petitioner did believe that his farm would begin to turn a profit in 1970 and that the farm would eventually be capable of generating $100,000 in gross receipts annually. Notwithstanding the absence of profits, petitioner did not regard Landfall Farm as a failure. 28 OPINION The sole question presented for our determination is whether the expenses incurred by petitioner in the operation of Landfall Farm are allowable deductions under section 162 [8] or section 212 [9] thereby permitting 29 the net losses incurred therefrom to be deducted from petitioner's gross income from other sources [10] pursuant to the provisions of section 165. [11] *31 The respondent does not dispute the actual expenditure of the aggregate amounts comprising the claimed losses, nor does he contend that such amounts were not "ordinary and necessary." Further, assuming the presence of a profit motive, there is no question that cattle raising constitutes a "trade or business" within the purview of section 162. See e.g. Mercer v. Commissioner, 376 F.2d 708 (C.A. 9, 1967). Accordingly, an attempt to fit petitioner's enterprise within the requirements of section 212 is unnecessary and we need only decide whether petitioner was motivated by an intention to make a profit from his cattle farm. Whether the activities of a taxpayer were carried on with the intention to make a profit, and thereby constitute a "trade or business" within the meaning of the statute, is necessarily a question of fact. As such, resolution of the question of the taxpayer's subjective intent [12] must be had from an examination of all of the surrounding facts and circumstances. 31 In ascertaining the presence or absence of a bona fide intention to make a profit, the prudence of the taxpayer's expectations is not a crucial factor.[13]Margit Sigray Bessenyey, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (C.A. 2, 1967), certiorari denied 389 U.S. 931 (1967); Hirsch v. Commissioner, 315 F.2d 731 (C.A. 9, 1963); Cf. Godfrey v. Commissioner, 335 F.2d 82 (C.A. 6, 1964).If the taxpayer has a good faith expectation of profit from a particular venture, irrespective of whether or not others might view that expectation as reasonable, his venture is a trade or business. Mercer v. Commissioner, supra at 711. 32 Further, it has been held that the activity must be initiated or conducted in good faith with an intention of making a profit. International Trading Co. v. Commissioner, 275 F.2d 578, 585 *32 (C.A. 7, 1960). From all of the facts before us, the Court concludes that petitioner initiated his cattle farming operation with the real and bona fide intention of deriving a profit therefrom and that he continued to conduct the farm up to and including the years in issue with that good faith intention intact. In attempting to discern petitioner's intent, numerous factors are relevant. A long history of losses, such as those encountered here, certainly has a bearing on the inquiry, but does not of itself change the character of a particular venture from one operated for profit to a hobby. See Wiles v. United States, 312 F.2d 574 (C.A. 10, 1962). Where, as here, it is initially recognized that developmental costs require a *33 substantial investment and that the risks are inherently great, a history of losses is less significant than in a less hazardous venture. Here petitioner did 33 take steps, such as raising hogs and placing some of his acreage in the Soil Bank Program, having the effect of offsetting some of those developmental costs. The respondent emphasizes the inadequacy of petitioner's records pertaining to his herds in arguing that petitioner lacked a profit motive. We think respondent's emphasis is misplaced. While the maintenance of such records is no doubt helpful and is indeed recommended by agricultural experts, in fact both petitioner's and respondent's experts testified that few cattle farmers maintained such records. Petitioner was of the opinion that his method of keeping track of his cattle worked best for his particular operation, and we have no reason to dispute his opinion. The Court is not prepared to expect from petitioner a record keeping procedure more stringent than that practiced by other farmers in the area solely because of losses incurred in his operation. With reference to petitioner's record keeping generally, we note that detailed accounts of 34 his farm *34 expenses were kept by petitioner and periodically forwarded to his bookkeeper for entry into the books maintained by her for petitioner. There was no commingling of residential or personal expenses with the operational costs of the farm. Cf. Teitelbaum v. Commissioner, 294 F.2d 541 (C.A. 7, 1961). Such attention to accounting for the farm's income and expenses evidence a concern for profits. Of greater significance than individual herd records to the outcome of this case is the time and attention devoted by petitioner to his farm. Contrary to many of the so-called "hobby loss" cases, see V. H Monette & Co., 45 T.C. 15 (1965), affirmed per curiam 374 F.2d 116 (C.A. 4, 1967), petitioner was not an "absentee" farmer who devoted his major efforts to what might be termed his principal business. Petitioner simply had no other business. Higgins v. Commissioner, 312 U.S. 212 (1941). He spent all of his time on the farm, managed it jointly with his superintendent making all of the decisions pertinent to its 35 operation, spent each morning walking or riding through his herds keeping track of the cattle, and was acutely aware of *35 the day-to-day activities of the farm.
Also significant is the fact that the farm was precisely that, a farm. Petitioner maintained no recreational facilities such as a swimming pool or stables and did little or no entertaining at Landfall Farm. Cf. Teitelbaum v. Commissioner, supra.The facilities of the farm were not extravagant or "showy." Rather, the buildings, barns, fences, etc., were ordinary in appearance and functional in design. Despite respondent's arguments to the contrary, we do not find petitioner's seven-room bungalow style house indicative of an intent on petitioner's part to create a "showplace" as opposed to a functional farm. Neither are we persuaded by respondent's arguments with respect to petitioner's reasons for starting Landfall Farm. While it is true that petitioner was familiar with the area of Leon County, Florida, had friends and family there, and possessed a desire to leave the confines of New York City, those factors do not 36 negate an intent to develop a profitable operation. Indeed, these or similar factors are often considered by major businesses when initiating or relocating a particular enterprise.Such considerations do not *36 obviate a business-minded purpose for the move. To the contrary, because of the very familiarity that respondent points to in attacking petitioner's decision to locate where he did, petitioner knew that the land he intended to farm was good, a fact readily corroborated by respondent's expert witness. Respondent's arguments with respect to the operation of the farm, while persuasive, do not negate our conviction that petitioner initiated and conducted the farm with an eye toward eventual profits. We agree with respondent's assessment that petitioner needed fewer farm hands, especially in the earlier years, than the number he employed and we are cognizant of the fact that petitioner expected a too high productivity rate per acre from his pastures. We, too, question the necessity for the purchase of an irrigation system, although its purchase is readily 37 understandable in light of the rainfall records for that particular time, just as we question the wisdom of placing some of his acreage in the Soil Bank Program. However, those items, together with others argued by respondent, evidence perhaps a lack of business judgment or farming acumen on petitioner's part, but do not indicate *37 a disregard for profits. With reference to respondent's contentions concerning the improbability of ever recouping the losses incurred, we are of a view that petitioner's realization of that probability was merely delayed for a few years beyond those here in issue. Petitioner had always projected, at least in his own mind, that the farm would begin to generate gross income in the neighborhood of $100,000 by 1970. As is often the case with many enterprizes, the realization that the endeavor is floundering and has little chance of success often comes too late. Such appears to be the case here. The inference is not only permissible, but indeed strong, that in 1970 petitioner finally realized that his hopes for profit were unfounded and he 38 thereupon commenced the liquidation of his herds at a time when beef prices permitted the most attractive recovery on the sale of his cattle. We also note that the general depression of beef prices in the early 1960's, exactly opposite to the predicted rise in prices for those years, while not actually causing petitioner's losses, contributed to their size. Admittedly, petitioner possessed an independent income, and that factor too is *38 relevant to our inquiry. Wright v. United States, 249 F. Supp. 508 (D. Nev. 1965). However, the operation of Landfall Farm involved a considerable financial drain on petitioner's income. Surely a man seeking to do so could have found a venture far less demanding of his physical and financial energies in which to "shelter" a portion of his income. The fact that petitioner was not dependent upon the farm for the source of his livelihood and the fact that he may have derived personal satisfaction from residing on a farm are not sufficient to overcome our determination that petitioner's principal motivation was to operate a profitable cattle raising farm. See Marcell N. Rand, 34 T.C. 1146 (1960). 39 For much the same reason, we are convinced that Landfall Farm was not engaged in as a "hobby." The large financial commitment, the high degree of risk, and the hours of physical labor each mitigate against the finding that this enterprise was petitioner's hobby. Further, the fact that this was a commercial farm, raising cattle for beef purposes, as opposed to the usual "hobby loss" breeding farm, buttresses our finding. Accordingly, upon examination of *39 the entire record, and for the reasons stated above, we hold that petitioner was engaged in the trade or business of raising commercial beef cattle during the taxable years 1966, 1967 and 1968. Decision will be entered for the petitioner. Footnotes
1. Respondent's determination that 80 percent of petitioner's claimed bookkeeping expenses were attributable to the farming operation has been conceded by petitioner. Accordingly, those expenses are deductible only if we find that the farm constituted a trade or business. ↩
2. According to the U.S. Department of Commerce, National Oceanic and Atmospheric Administration, Environmental Data Service, in a 1971 publication, a "dry period" in 1955-56 caused most lakes in the area of Landfall Farm to disappear completely. ↩
*. Total acreage includes 175 acres placed in the Soil Bank Program from 1958 through 1968, but does not include rented land upon which crops were grown or approximately 80 acres of Landfall Farm devoted to roads, buildings, fences, lakes, and petitioner's personal residence. 9 During the "growing season," the amount of precipitation affects both supplemental feed crops and the growth of pasture land. In dry periods, a greater amount of fertilizer might be used, with lesser results, than in a period of normal rainfall. Generally, in Leon County, Florida, precipitation in the period from March to July has the greatest effect on corn production and pasture land. The actual rainfall and total deviation from the mean average for the months of March through July for the years 1953 to 1971, inclusive, were as follows: 10 Year
March
April
May
June July Total
mean 4.90
mean 3.80
Mean 3.83
mean 6.56
mean 7.99
Deviation
Acual
Actual
Actual
Actual
Actual
From Mean
1953
1.08
7.26
0.80
8.26
5.77
-3.91
1954
2.22
1.02
3.12
5.26
5.97
-9.49
1955
0.9 3.67
0.85
5.99
10.51
-5.07
1956
2.00
1.90
5.71
7.32
9.78
-0.37
1957
5.65
5.26
8.01
9.69
8.89
+10.42
$ 61958
5.44
8.76
5.45
5.15
6.91
+4.63
1959
11.15
3.65
9.73
8.99
7.41
+13.8 5
1960
4.03
7.19
3.25
9.65
5.59
+2.63
1961
4.43
2.36
2.40
4.55
6.48
-6.86
1962
10.66
2.41
0.98
6.98
4.8 7
-1.18
1963
2.76
1.68
5.49
9.23
7.13
-.79
1964
3.06
5.61
2.63
8.16
20.12
+13.50
1965
7.86
7.14
-- 12.6 2
8.09
+8.63
1966
3.24
2.21
8.23
8.05
6.54
+1.19
1967
1.29
1.44
5.43
5.00
8.31
-5.61
1968
2.10
1.06
4.0 0
2.96
4.89
-12.07
1969
9.13
2.02
4.38
4.8 18.83
+12.16
1970
11.49
3.57
2.41
4.80
16.13
+11.32
1971
4.81
1.85
4.08
7.44
10.80
+1.90 11 Petitioner's personal residence was built in the northern section of Landfall Farm in 1953 at a cost of $28,645.51. The house, containing seven rooms, was remodeled at various times at a total cost of $43,388.24. No depreciation or expenses attributable to petitioner's residence were claimed as costs of operating the farm. In addition to the residence, various buildings used in the operation of the farm and subject to depreciation were purchased or constructed on Landfall Farm as follows: Facility
Cost
Barn, utility buildings, sheds
$ 87,000
Superintendent's house
45,000 Tenant houses
54,000 Laundry house
1,000 The foregoing buildings were adequate for the farm's operations and had a wholly functional appearance. There were no elaborate or decorative stables, barns, or fences nor were there any recreational or entertainment facilities. As a whole, Landfall Farm had the general appearance of an ordinary farm. 12 During the years in issue, petitioner employed several full-time employees at the farm, including his farm superintendent, Sylvester C. Womack (hereinafter sometimes referred to as "Womack"). Extra farm workers were hired by petitioner as necessary, principally during the harvest season. The following schedule sets forth for the years 1966, 1967, and 1968 the employees and their respective compensation: 1966
Employee
Compensation
Sylvester C. Womack
$ 6,360.00
George Wallace Sessions
2,870.00 Odel Baity
1,828.50 Buster Reynolds
1,828.50 Leroy Young
1,828.50 Clarence S. Womack
1,060.00 Henry Baity
665.00 Issac Reynolds
212.50 TOTAL
$ 16,653.00
1967
Employee
Compensation
Sylvester C. Womack
$ 6,345.00
Odel Baity
2,045.00 Buster Reynolds
2,045.00 Leroy Young
2,005.00 Clarence S. Womack
1.040.00 Henry Baity
1,399.55 TOTAL
$ 14,879.55
1968
$ 14,879.55
Employee
Compensation
Sylvester C. Womack
$ 6,500.00
Odel Baity
2,080.00 Buster Reynolds
2,080.00 Leroy Young
2,080.00 Henry Baity
1,095.45 Clarence S. Womack
1,040.00 TOTAL
$ 14,875.45
Petitioner provided housing, electricity, propane gas, and a prefabricated laundry facility for his full-time farmhands in addition to their wages. Both the number of farmhands and the wages paid (averaging $13,561 for the period 1955 to 1972, inclusive) have remained fairly constant throughout the years of the farm's operation. Sylvester Womack, the farm superintendent, had worked for petitioner since the inception of the farm in 1953. Womack was born and raised on a farm which raised cattle, hogs, and crops and has spent his entire life in farming. Prior to his employment by petitioner, Womack worked as a labor supervisor on a tobacco farm. 14 As a part of his duties at Landfall Farm, Womack was responsible for the supervision of the other employees. In addition, Womack met with petitioner on a daily basis during which meetings they physically examined the pasture land of the farm and the herds thereon and discussed current operations and future planning. Petitioner sought out and acted on his superintendent's advice on most farm matters. Both petitioner and Womack were aware of and concerned with the day-to-day operational costs of the farm. In essence, the management of Landfall Farm was effected jointly by petitioner and Womack. Landfall Farm attempted to do as much of its own work as possible. To that end, the farm had its own machinery shop and welding equipment for doing its own repairs and had its own hammer mill for grinding the feed used on the farm. Petitioner first acquired a herd consisting of 3 Hereford bulls and 180 Hereford cows in August 1953 at a total cost of $12,501.60. Thereafter, petitioner decided that the Hereford herd had been acquired 15 prematurely because the farm was not yet ready to support it. Therefore, in 1955, 1956, and 1958, petitioner sold all cattle in the herd acquired in 1953. For the 2 years thereafter during which period the development of the farm continued, petitioner raised hogs as a means of producing some income to offset the costs of bulldozing, fencing, and otherwise developing the operation. In 1958, petitioner placed 200 acres Due to the presence of a lake on a portion of the acreage, the Government's payments to petitioner were predicated on 175 acres. [3]↩ of Landfall Farm into the U.S. Department of Agriculture Soil Bank Program for which he was paid $2,346 per annum on a 10-year contract. Petitioner's decision to place 200 acres in the Soil Bank Program was admittedly a mistake. As the development of the farm progressed, the acreage in said program became needed, contrary to petitioner's earlier assumptions. In 1966 and 1967, petitioner rented 300 acres of land upon which he grew corn for use as supplemental feed and for sale on the market. *. Petitioner's books do not reflect the same means of classifying cattle sold in each year. ↩
4. Cattle delivered, but payment receivable. ↩
5. Number estimated; herds 1 and 5 sold. ↩
6. Loss of $10,803.11 on sale of equipment. ↩
7. Includes long-term capital gain of $16,511.00 on sale of sec. 1231 breeders. ↩
8. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. Sec. 162 provides, in pertinent part: SEC. 162. TRADE OR BUSINESS EXPENSE. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - ↩
9. Sec. 212 provides, in pertinent part: SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year - (1) for the production or collection of income; ↩
10. Sec. 1.162-12, Income Tax Regs., provides in pertinent part: (a) Farms engaged in for profit. A farmer who operates a farm for profit is entitled to deduct from gross income as necessary expenses all amounts actually expended in the carrying on of the business of farming.* * * (b) Farms not engaged in for profit; * * * (1) In general. If a farm is operated for recreation or pleasure and not on a commercial basis, and if the expenses incurred in connection with the farm are in excess of the receipts therefrom, the entire receipts from the sale of farm products may be ignored in rendering a return of income, and the expenses incurred, being regarded as personal expenses, will not constitute allowable deductions. ↩
11. Sec. 165 provides, in pertinent part: SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under section (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and 30 ↩
12. It is noted that sec. 183, applicable to years subsequent to those here in issue, was intended to at least in part remove the subjectivity from an inquiry into whether the taxpayer was engaged in an activity for profit. See S. Rept. No. 91-552, to accompany H.R. 13270 (Pub. L. 91-172), 91st Cong., 1st Sess., p. 104 (1969). ↩
13. The imposition of a "reasonableness of expectation test" was initially considered by the House Ways and Means Committee as part of an amendment to sec. 270. This approach was rejected by the Senate Finance Committee. See H. Rept. No. 91-413 (Part 1), to accompany H.R. 13270 (Pub. L. 91-172), 91st Cong., 1st Sess., p. 71 (1969), and S. Rept. No. 91-552, to accompany H.R. 13270 (Pub. L. 91-172), 91st Cong., 1st Sess., p. 103 (1969). ↩