CHARLES O. GIVENS and BARBARA K. GIVENS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Givens v. Commissioner
Docket No. 12707-88
United States Tax Court
T.C. Memo 1989-529; 1989 Tax Ct. Memo LEXIS 529; 58 T.C.M. (CCH) 255; T.C.M. (RIA) 89529; September 27, 1989
Alan N. Shovers, for the petitioners. Timothy S. Sinnott, for the respondent. GALLOWAY
MEMORANDUM FINDINGS OF FACT AND OPINION GALLOWAY, Special Trial Judge: This case was heard pursuant to the provisions of section 7443A(b) of the Internal Revenue Code of 1986 and Rules 180, 181 and 182. [1]
*532 Respondent determined deficiencies in petitioners' Federal income tax as follows: Year
Deficiency
1979
$ 971.00  1980
2,505.24  1981
3,113.00  1982
3,607.00  1983
1,223.11  1984
1,739.00  Respondent also determined that petitioners are liable for additional interest pursuant to section 6621(c) [2] for the years 1980 through 1984. The issues for decision are: (1) whether petitioners' horse breeding activity during the taxable years constituted an "activity not engaged in for profit" within the meaning of section 183(a); (2) whether petitioners' venture of raising cattle was an "activity not engaged in for profit" in the years 1981-1984; and (3) whether petitioners are liable for the additional interest imposed *533 by section 6621(c) on tax-motivated transactions. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are so found. The stipulation of facts and related exhibits are incorporated herein by this reference. Petitioners Charles O. and Barbara K. Givens, husband and wife, resided in Mt. Vernon, Posey County, Indiana, at the time they filed their petition in this case. Petitioners timely filed joint Federal income tax returns for the years in issue with the Internal Revenue Service Center in Memphis, Tennessee. Charles O. Givens (petitioner) has an accounting background. He received a degree in accounting from the University of Evansville in 1968. Petitioner then commenced working at General Electric Company. During the first years of his employment, petitioner was in the accounting department of General Electric. During 1979 and part of 1980, petitioner was employed full-time as a manager of materials for General Electric Company. From 1980 to 1983, petitioner was an administrative assistant for a United States congressman's staff. Since 1983, he has been an investment broker. All of petitioner's employment was located in Evansville, Indiana, located *534 20 miles from Mt. Vernon. Petitioner's wife worked as a part-time interior decorator until 1980, when she became employed full-time as a legal secretary. Combined net income from both petitioners' occupations for 1979 through 1984, inclusive, was the following: Year
Income
1979
$ 32,065.91
1980
49,153.21  1981
51,379.18  1982
58,737.84  1983
23,675.25  1984
49,275.30  Petitioner and his wife had no substantial income other than that earned from employment. Petitioners have three children, who in 1979, ranged from approximately 5 to 16 years of age. Petitioner's first involvement with horses began in 1956 when his father purchased and operated a horse stable. Petitioner assisted his father in this business until its closure in 1964. His interest in horses continued. Between 1965 and 1979, petitioner owned two horses and a pony, on his acreage with a barn and house located thereon. Prior to 1979, petitioner attended numerous horse sales. Petitioner believed "there [was] money to be made if [he] got the right quality broodmare and [could] get the right colt to raise." Petitioner therefore began discussing with several acquaintances *535 in the Mt. Vernon area and his father the feasibility of raising horses for breeding purposes. After attempting to breed one of his horses in Tennessee, petitioner decided to begin the activity of breeding registered Tennessee Walking Horses, which are used as show horses. Petitioner "had dreams of raising the next World Grand Champion, a horse [he] could sell for 25 or $ 50,000", not an usual price for a Tennessee Walking Horse. In March 1979, petitioner started his horse breeding venture by purchasing a 40 acre farm for $ 20,000 called Charleston Valley Stables (Valley Stables), which consisted of a farm road, a pond with an emergency spillway, 21 acres of pasture and 13 acres of woodlands. Valley Stables initially was used solely to carry on petitioner's horse breeding activity. From 1980 to 1984, petitioner rented a portion of the land to a mobile home owner. In addition he boarded a neighbor's horse from 1979 to February 1980. Petitioner did not expect income from his horse breeding activity for several years. It takes 23 months from the time a mare is bred until a colt is born, raised and can be sold. In 1981, petitioner expanded his venture to include the raising *536 and sale of cattle. Petitioner first purchased calves in the Spring of 1981 and sold most of these cattle in the Fall of that year. When petitioner commenced his horse breeding activity in 1979, he became personally involved with all aspects of that activity. Petitioner spent an average of 2 to 4 hours a day during the week and up to 4 to 6 hours on weekends doing chores and general maintenance of his property as it related to his horses and also to his cattle after he purchased calves in 1981. Petitioner's chores consisted of feeding and watering the horses and cattle two times a day, grooming horses, cleaning and repairing stalls, building and repairing fence around the farm and pastures, thinning and clearing woodlands, baling and hauling hay and driving into town to purchase feed or farm materials. Occasionally, petitioner hired outside labor where required. Petitioner's sons and father also assisted part time in the performance of these duties. Petitioner's family took only one vacation during the years 1979-1984. Petitioner prepared and filed all tax returns for the years in issue. The returns included detailed farm, depreciation and employee business expense schedules. *537 Petitioner maintained records of his horse breeding and cattle raising activities on separate ledgers. In June 1981, petitioner became a member of the Posey County Soil and Water Conservation District for the express purpose of availing himself of resource conservation planning assistance. The Agronomy Department from Purdue University did plant and soil tests, and the United States Department of Agriculture surveyed petitioner's property, with both organizations furnishing conservation recommendations. Relying on these recommendations, petitioner planted alfalfa and implemented rotational grazing on his pastures. To reduce his feed costs, he partially cleared and thinned his woodlands. Petitioner sought other methods of conservation by purchasing and studying a variety of articles and pamphlets. Some of the articles included: Pasture and Hay Management, Developing Pond and Areas for Wildlife, Woodland Weeding, Critical Area Planting, Management of Tall Fescue for Winter Pasture, and Vegetating the Farm Pond Fill, Spillway and Barn Areas. Petitioner also purchased reading material concerning breeding and raising of horses and cattle. Before purchasing his first horse, petitioner *538 sought advice from Jack Fuelling, a long-time friend and horse trainer, breeder and trader. In addition, he received advice during the course of his operation from other local horse owners and trainers as well as his father. The following table reflects petitioner's buying and selling of mare and stallion Tennessee Walking horses: Horse
Type
Purchased
Cost
Sold
Price
Merry Morningstar
M
[3] -
-    -   -    Ribbon of Darkness
M
4/79
$ 1,500  -   -    Delight's Mack K. Allen
S
8/79
400  9/80
[4] trade
Senator's Dixie
M
9/80
trade
Died
L's Star Mickey
M
3/81
300  -  -   To achieve his goal of raising and selling a grand champion Tennessee Walking horse, *539 petitioner purchased mares during 1979-1981, with the exception of one stallion purchased in 1981 for breeding purposes. The horse was traded in 1980 because it was unsuccessful as a stud. After 1981, petitioner paid stud fees to have his horses impregnated. Prior to breeding his mares, petitioner would have his mares checked by a veterinarian to make sure the mares were capable of becoming pregnant. Between 1979 and 1984, there were four foals born at Valley Stables. The following table reflects the mares' foaling activity: Name
Born
Sold
Price
Ebony Legacy
2/81
9/81
$ 1,500
Ebony Tradition
10/82
8/84
$ 1,350
Senator's Gracious Lady
4/83
-  -
Ebony Silhouette
3/84
3/85
50
Ribbon of Darkness gave birth to three of the foals: Ebony Legacy, Ebony Tradition and Ebony Silhouette. Senator's Gracious Lady was foaled from Senator's Dixie. Petitioner repeatedly bred Merry Morningstar and L's Star Mickey. However, no foals were produced. In 1984, petitioner's veterinarian recommended against further attempts to impregnate Merry Morningstar and L's Star Mickey. In September of that year, Senator's Dixie died of a ruptured stomach due *540 to a virus. Because of her close proximity to a Grand Champion bloodline, petitioner considered Senator's Dixie to be his most valuable breed mare. A mare with a comparable bloodline would have been too costly to replace. Petitioner reviewed the results of his losses after six years of horse breeding activity and decided that after 1984, he would discontinue this activity and not deduct expenses incurred. For the taxable years 1979 through 1984, petitioner reported losses from his horse breeding and cattle raising activities on Form 1040, schedule F as follows: Total
Total
Taxes and
Profit (or)
Year
Income
Expenses
Depreciation
Interest
Loss
1979
$ 420.00  $ 3,611.87
$ 467.70    $ -0-      ($ 3,659.57)
1980
375.00
6,017.61
1,075.07  5.50   (6,723.18)
1981
1,937.60
7,990.01
1,323.00  549.69   (7,925.10)
1982
873.56
6,338.79
3,705.05  65.84   (9,236.12)
1983
120.00
6,498.93
2,002.44  -0-   (8,381.37)
1984
2,314.97
5,426.60
3,418.00  -0-   (6,529.63)
TOTAL:
$ 6,041.13
$ 35,883.81
$ 11,991.26  $ 621.03   ($ 42,454.97)
In his notice of deficiency, *541 respondent disallowed all of petitioner's expense deductions and depreciation related to the horse breeding and cattle raising activities for years 1979 through 1984. [5] At trial, petitioner introduced into evidence schedules he had prepared from his accounting records, which reported separately his losses from the horse breeding and cattle raising activities. From 1979 through 1984, the horse breeding activity income and expenses disclosed from petitioner's records were as follows: 1979
1980
1981
1982
1983
1984
Income:
$ 420.00  $ 375.00 $ 1,680.00 $ 120.00 $ 120.00 $ 1,920.00 Expenses:
Interest  & Taxes   -0-   (5.50)
(139.06)
(32.92)
-0-  -0-    Other  expenses   (3,611.87)
(6,017.61)
(5,462.39)
(3,809.24)
(4,536.21)
(3,330.96)
Depreciation
(467.70)
(1,075.07)
(786.50)
(1,977.52)
(1,445.23)
(2,118.00)
Total Income
(Loss)   (3,659.57)
(6,723.18)
(4,707.95)
(5,699.68)
(5,861.44)
(3,528.96)
Petitioner's cattle raising activity income and expenses for the years 1981 through 1984 were as follows: 1981
1982
1983
1984
Income
$ 257.60 $ 753.56 -0-   $ 394.97 Expenses:
Interest & Taxes  (410.63)
(32.92)
-0-   -0-  Other Expenses  (2,527.62)
(2,529.55)
(1,962.72)
(2,095.64)
Depreciation  (536.50)
(1,727.53)
(557.21)
(1,300.00)
Total Income (Loss)
(3,217.15)
(3,536.44)
(2,519.93)
(3,000.67)
*542 OPINION The first issue for decision is whether petitioner's horse breeding activity was engaged in for profit within the meaning of section 183(a). Section 183(a) provides the general rule that if an individual engages in an activity, and "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(b)(1) provides that deductions which would be allowable without regard to whether such activity *543 is engaged in for profit shall be allowed. Section 183(b)(2) provides that deductions which would be allowable only if such activity is engaged in for profit shall be allowed, "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of" section 183(b)(1). Section 183(c) defines an activity not engaged in for profit as follows: (c) Activity Not Engaged in for Profit Defined. -- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. Furthermore, section 183(d) provides the presumption that an activity is engaged in for profit if for any 2 of 7 consecutive taxable years for horse breeding and 2 of 5 consecutive taxable years for cattle raising, the gross income derived from the activity exceeds the deductions attributable to such activity. Because petitioner's activities never produced a profit, such presumptions are not in effect in this case. The test for determining whether an individual is entitled to deduct *544 his expenses is whether the individual's objective in engaging in the activity is to make a profit. Sec. 1.183-2(a), Income Tax Regs.; Golanty v. Commissioner, 72 T.C. 411, 425 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981); Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980); Allen v. Commissioner, 72 T.C. 28, 33 (1979). The expectation of profit need not be reasonable; it is sufficient if there is "an actual and honest profit objective." Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Lemmen v. Commissioner, 77 T.C. 1326 (1981); Golanty v. Commissioner, supra at 425-426. The issue of whether there is the requisite objective to make a profit is one of fact to be resolved on the basis of all the surrounding facts and circumstances of the case. Finoli v. Commissioner, 86 T.C. 697, 722 (1986). The burden of proving such objective is on petitioner. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). *545 We give greater weight to objective facts than to a taxpayer's after-the-fact statements of intent. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986). Section 1.183-2(b), Income Tax Regs., sets forth some of the relevant factors, derived principally from prior case law, which are to be considered in determining whether an activity is engaged in for profit. Allen v. Commissioner, 72 T.C. at 34; Benz v. Commissioner, 63 T.C. 375, 382-383 (1974). Such factors include: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. A profit *546 objective may be analyzed in relation to the nine factors set out in respondent's section 183 regulations, but those factors are not applicable or appropriate for every case. The facts and circumstances of the case in issue remain the primary test. Abramson v. Commissioner, 86 T.C. 360, 371 (1986). For tax return purposes, petitioner considered his horse breeding and cattle raising activities as one business. Petitioner disclosed the combined losses from these activities on Form 1040 Schedule Fs for the years 1981-1984, using Charleston Valley Stables as his farm name. However, in his testimony, petitioner frequently described his activities as "two businesses," and as noted above, petitioner maintained separate profit and loss records for each activity. After reviewing the record, we conclude that petitioner, in carrying on his alleged business at Valley Stables, was engaged in two separate activities, a horse breeding activity and a cattle raising activity. Each of these activities should be separately measured against the standards of section 183 for the purpose of determining whether petitioner had the requisite objective of making a profit. Cf. Dickson v. Commissioner, T.C. Memo 1983-723. *547 In this case, we find that petitioner conducted his horse breeding activity in a businesslike manner. Sec. 1.183-2(b)(1), Income Tax Regs. Although petitioner did not maintain a separate checking account for his activity, he did separate the activity's expenses from personal expenses. He kept a continuous detailed account and record of "horse business" expenses on separate cash disbursement ledger sheets which were totalled annually. The local Farm Bureau co-op sent petitioner a monthly statement of his expenses. This statement was broken down into horse breeding and cattle raising expenses as well as purchases and other items. This enabled petitioner to separately record his monthly expenditures. Petitioner also acted in a businesslike manner by his willingness to change his farm's operations. He joined the Posey County Soil Water Conservation District for the express purpose of informing himself about conservation methods. Purdue University and the United States Department of Agriculture surveyed and advised petitioner of potential conservation methods with respect to the farm's plant and soil. Believing his expenses would be reduced, petitioner followed their recommendations. *548 Furthermore, petitioner tried to reduce costs and diversify his operation by purchasing a stallion, Delight's Mark K. Allen. He bred his mares with the stallion and advertised the stallion's availability to other horse owners for a stud fee. Unfortunately, the stallion was not of the right temperament for breeding and was immediately traded for a mare which could be used in petitioner's horse breeding activity. Prior to entering the horse breeding operation, petitioner had substantial experience with horses because he grew up on a farm with horses and owned several horses himself. However, he did not have experience breeding show horses. During the next six years, petitioner sought and acquired advice in all aspects of Tennessee Walking Horse breeding from his father, who had once been in the horse racing business, a friend who had once been a stable owner/trainer, and his veterinarian. The experience gained by petitioner and the expertise of his advisors demonstrate petitioner's requisite objective of making a profit. See sec. 1.183-2(b)(2), Income Tax Regs. See also Nickerson v. Commissioner, 700 F.2d 402, 407 (7th Cir. 1983), wherein the court stated: "efforts *549 at gaining experience and a willingness to follow expert advice should * * * be considered" in determining a profit objective. Although petitioner was employed full-time except for several months in 1983, he managed to devote considerable time to the operation of Charleston Valley Stables. Petitioner spent approximately 2 to 4 hours daily doing chores and farm maintenance with more time being spent on weekends. During the time petitioner was unemployed in 1983, he worked extra hours erecting a fence around his farm. The time expended by petitioner in his activity supports the conclusion that petitioner had the requisite objective of making a profit. Sec. 1.183-2(b)(3), Income Tax Regs.
During 1979-1984, petitioner incurred continuous losses of over $ 30,000 in his horse breeding activity. Occasional profits were not earned during any of these years. Sec. 1.183-2(b)(6), (7), Income Tax Regs. Nevertheless, petitioner was able to monitor his losses during these years by use of accurate accounting records. Such records were instrumental in petitioner's decision to abandon his horse breeding activity when it became apparent that the chances of achieving his ultimate goal of realizing *550 an overall net profit from this activity had become remote, if not impossible. This he did in September 1984 after the death of his hoped for Grand Champion bloodline horse, Senator's Dixie. At that time, petitioner testified that he "was virtually out of business from a horse standpoint." He discontinued this activity at the end of 1984. The speed with which a taxpayer ceases operations of an activity when he determines they will not be profitable is an important factor evidencing his profit objective. See Feldman v. Commissioner, T.C. Memo. 1988-126. Upon review of the entire record, we are satisfied that petitioner had the requisite profit objective when he engaged in his horse breeding activity during the years 1979-1984. Petitioner is sustained on this issue. The next issue is whether petitioner's venture of raising cattle during the years 1981-1984 was an activity not engaged in for profit. Petitioner gave limited testimony with respect to his cattle raising activity. Unlike the horse breeding activity, petitioner had no prior experience in raising and selling cattle. There is no evidence that petitioner spoke to others as to the feasibility of commencing *551 a cattle raising operation for profit in conjunction with his horse breeding activity. Petitioner testified that he had planned to engage in cattle raising when he acquired Valley Stables in 1979, but this operation was delayed until petitioner could complete fencing the property. However, petitioner admitted that the cattle raising activity was financially unsuccessful from its beginning in 1981. He stated "I seemed to get into the cattle business about the same time as the price of cattle went down, and the price of feed was going up * * * it seemed like that the price of beef just kept going down. The price of feed just kept going up." In March 1982, petitioner filed Form 5213 (Election to Postpone Determination with Respect to the Presumption that an Activity Is Engaged in for Profit). On this form, petitioner described his cattle raising activity as follows: "(2) Feeder Cattle operation - no brood stock." Petitioner testified he first bought Holstein calves for raising and sale. Petitioner next purchased Black Angus calves, and then Holstein calves once again. Petitioner failed to explain why he thought a profit would result from the raising and sale of both dairy and *552 beef cattle as feeder cattle. In fact, we were unable to determine from this record whether petitioner even devised a plan to reduce the losses of his cattle operation which began as soon as he commenced his cattle raising activity. After considering all the facts and circumstances of this case, we conclude that petitioner has not sustained his burden of proving that he had the requisite objective of making a profit from the raising and sale of cattle. Abramson v. Commissioner, 86 T.C. at 371. Respondent is sustained on this issue. The final issue is the interest imposed on tax-motivated transactions imposed by section 6621(c). The increased rate of interest is 120 percent of the statutory rate imposed on underpayments. Sec. 6621(c)(1). A tax-motivated transaction includes any valuation overstatement, as defined in section 6659. Sec. 6621(c)(3)(A)(i). The underpayment attributable to the transaction must exceed $ 1,000. Sec. 6621(c)(2). The Secretary has the authority to specify other types of transactions that will be treated as tax-motivated. Sec. 6621(c)(3)(B). Deductions disallowed for any period under section 183 relating to an activity not engaged *553 in for profit are included in the temporary regulations, sec. 301.6621-2T Q-4, Temp. Proced. & Admin. Regs., 49 Fed. Reg. 50394 (Dec. 28, 1984). See Patin v. Commissioner, 88 T.C. 1086, 1129 (1987), affd. sub nom. without published opinion Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989); Soriano v. Commissioner, 90 T.C. 44, 62 (1988). In view of our decision section 6621(c) applies in any of the years 1981, 1982, 1983, and 1984 if the amount of the underpayment attributable to tax-motivated transactions exceeds $ 1,000 for a specific year. The application of section 6621(c) ultimately will have to be determined in the course of Rule 155 computations for these years. See Bailey v. Commissioner, 90 T.C. 558, 630 (1988). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise provided, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Prior to the Tax Reform Act of 1986, subsec. (c) was designated subsec. (d). Sec. 1511(a), Pub. L. 99-514, 100 Stat. 2085, 2744. The additional interest applies only after Dec. 31, 1984, and notwithstanding that the transaction was entered into prior to that date. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005↩ (2d Cir. 1986).
3. Merry Morningstar was born in 1966 on petitioner's acreage. Petitioner allocated use of this mare 50 percent to business and 50 percent to personal during the taxable years. ↩
4. Petitioner reported ordinary income of $ 403 on Form 4797 attached to his 1980 return (Supplemental Schedule of Gains and Losses), from the trade of a stallion. Respondent reclassified the amount reported as income earned from petitioner's activity.↩
5. On his tax returns, petitioner reported non-business (itemized) deductions on Schedule As attached to his returns in all years. Accordingly, in disallowing the reported losses, respondent failed to allow the amounts of interest expense claimed as activity expenses in the years 1980, 1981 and 1982. Under section 183(b)(1) certain deductions (such as interest and taxes) are allowable regardless of whether an activity generates gross income. No interest expense was claimed in 1983 or 1984. Cf. Van Scoyoc v. Commissioner, T.C. Memo. 1988-520↩ footnote 18. Respondent will correct his errors in the applicable years when filing his Rule 155 computation.