T.C. Memo. 1996-509


UNITED STATES TAX COURT


FREDERICK G. HARRISON, SR. AND ESTATE OF
CATHERINE HARRISON, DECEASED, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 26617-93.                Filed November 14, 1996.


<u>Dermot F. Kennedy</u>, for petitioners.

<u>James C. Fee, Jr.</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined a $62,125 deficiency in petitioners' 1989 Federal income tax and a $12,425 accuracy-related penalty for that year.

The issues for decision are: (1) Whether a gold mining and treasure salvaging activity[1] was not engaged in for profit by petitioner[2] and thus, losses claimed in connection with this activity were not deductible under section 183;[3] (2) if the activity was engaged in for profit, whether the losses constitute nondeductible passive activity losses under section 469; (3) whether a loss from rental property was properly disallowed as a passive activity loss pursuant to section 469; and (4) whether petitioners are subject to the accuracy-related penalty under section 6662 due to an underpayment of tax attributable to negligence or an intentional disregard of rules or regulations, or a substantial understatement of income tax. Respondent does not argue that any of the losses should be disallowed for failure to substantiate, nor does she argue that petitioner's expenditures were in effect contributions by petitioner to the capital of the treasure hunting venture; thus, we will not consider these issues.

---

[1] It was conceded at trial that all of the gold mining and treasure salvaging (also referred to as treasure hunting) operations constituted one activity for purposes of sec. 183 and sec. 469.

[2] All references to "petitioner" in the singular refer to Frederick G. Harrison.

[3] All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners, Frederick and Catherine Harrison, were husband and wife and resided in Marlton, New Jersey, at the time they filed their petition in the instant case. On January 16, 1994, Catherine Harrison died, and her estate was substituted as a petitioner.

During 1989, petitioner Frederick G. Harrison owned and operated three trucking and solid waste removal businesses in Pennsylvania and New Jersey. The waste removal business in New Jersey was a family owned business that petitioner started over 20 years ago. The waste removal business in Pennsylvania was also a family business run by petitioner and his son. The third business, consisting of trucking and waste disposal, was operated by Penn Foundry, Inc. (Penn). Petitioner owned one-third of Penn. Petitioner's son was also an owner of Penn. The trucking and waste management businesses were considered by Mr. Harrison to be his "working companies", and they were generally profitable. Mr. Harrison was around 65 years old in 1989.

Prior to 1989, Mr. Harrison owned a one-quarter interest in a trash transfer station in Philadelphia, Pennsylvania, known as LaForge, Inc. LaForge was sold in 1988 to a public company for $4.8 million; Mr. Harrison's share of the proceeds was worth approximately $1.2 million and was paid in stock.

Petitioners owned a home and a farm in Marlton, New Jersey, which were situated on 44 acres. Petitioners lived at the farm. Petitioners also owned a second home in Tucson, Arizona, which they purchased in 1985. Petitioners owned the New Jersey farm and residence and the Arizona residence with no outstanding mortgages on either property. Petitioners purchased another residential property in Atco, New Jersey, which they bought in 1989 to use as a rental property. They purchased the Atco property for $80,000 and had a $60,000 mortgage on the property.

Petitioners reported adjusted gross income on their tax returns for 1987, 1988, and 1989 in the respective amounts of $56,692, $247,041, and $133,235. Petitioners' adjusted gross income for 1989, without regard to losses claimed for treasure hunting and gold mining, would have been $334,764.

Mr. Harrison first developed an interest in gold mining through a company called Christine Enterprises in 1985. Christine Enterprises conducted its mining operation in the Sonora section of Mexico. Christine Enterprises conducted this gold mining activity with an individual named Thomas Daley. Mr. Daley was an engineer who had studied mining and geology at Tucson University. Mr. Harrison sought Mr. Daley's assistance in an attempt to find gold nuggets by placed mining.[4] Mr. Harrison did not find any gold with Christine Enterprises. In addition to

_____

[4] Placed mining is a form of panning for gold flakes and nuggets in streams and rivers after the winter thaw.

his activities with Christine Enterprises and Thomas Daley, Mr. Harrison panned for gold from 1985 to 1989 with Alex Saldivar. Mr. Harrison did not recover any discernible amounts of gold from his mining activities from 1985 to 1989.

During 1989, petitioners frequently visited Las Vegas, Nevada. Mr. Harrison first became interested in treasure hunting during one of his trips to Las Vegas in early 1989. Sometime during the first quarter of 1989, Mr. Harrison met two gentlemen, Patrick Payne and Hans Kruse, at the Hilton Hotel in Las Vegas, Nevada. These individuals introduced Mr. Harrison to the idea of searching for sunken Spanish galleons. Mr. Harrison had no experience in treasure hunting prior to that time. Shortly after this initial meeting in Las Vegas, as part of his investigation, Mr. Harrison traveled to San Diego, California, to meet other individuals associated with Patrick Payne. The other individuals were Jerry James, Larry Haimson, and Glenn Tillman. Jerry James, Patrick Payne, and Larry Haimson were associated with International Recoveries, Inc. International Recoveries was formed to seek treasures.

While in San Diego, petitioner also met with Glenn Tillman. Glenn Tillman was the operation manager of the various survey operations conducted by International Recoveries, though he was not an owner of International Recoveries. Petitioner met with several of the members of International Recoveries, as well as Mr. Tillman, and did some investigation or independent research

concerning the backgrounds of these individuals.  Petitioner received Glenn Tillman's resume during his San Diego meeting in the early part of 1989.  Petitioner relied upon this resume in making his decision to enter into a joint venture to hunt for gold and treasure with International Recoveries.  As part of his investigation into Mr. Tillman's qualifications and expertise, petitioner contacted the Mel Fisher organization,[5] a prior employer of Mr. Tillman, in order to verify his expertise.  Mr. Tillman was given a favorable report.  Mr. Tillman's qualifications encouraged petitioner to participate in this venture.

Mr. Harrison did not see or rely on any information that showed any prior salvage operations conducted by International Recoveries or its owners.  With respect to the salvage operation contemplated by International Recoveries, petitioner was shown papers and reports of its prospective activities.  He saw no financial data about International Recoveries before becoming involved with that company or its principals.  Petitioner entered

---

[5]  The Mel Fisher organization was a very successful treasure hunting group.  His group spent millions of dollars searching for the Atocha, a Spanish galleon.  In 1980, Fisher found the Margarita, another galleon, whose treasure yielded $20 million, which was insignificant compared with the expected yield of the Atocha.  In 1985, Fisher discovered the Atocha.  The treasure that was discovered included nearly 40 tons of silver bars, over 2,300 natural, uncut gems with some weighing up to 77 karats, gold chains as much as 50 feet long, and other items such as weapons and personal items.  Mr. Tillman was not with this group at the time of the Atocha discovery.

into a joint venture with International Recoveries, Inc., based on business plans and maps that were shown to him as well as his evaluation of the other investors and Mr. Tillman's expertise in the area.

When assessing potential transactions for his trucking and waste management businesses, Mr. Harrison generally sought legal assistance.  Mr. Harrison did not seek legal assistance with respect to his dealings with International Recoveries.

Petitioner went to libraries and read books and other publications regarding treasure hunting.  The materials petitioner referred to did not discuss the cost of treasure salvaging or how to make a treasure hunt economically feasible.

Petitioner set no specific budget with respect to his gold mining and treasure hunting activity.  Mr. Harrison was invited to join International Recoveries in its ongoing exploration for sunken treasures for an investment of $50,000.  For this investment, petitioner was to share in any recovery.  Petitioner did not agree to the first offer to join International Recoveries and negotiated a better deal than that originally presented.

During 1989, the International Recoveries group participated in three primary expeditions with petitioner.  The group was involved in operations off the Florida Keys, off the coast of Louisiana near the base of the Mississippi River, and on a farm in Goliad, Texas.

With respect to the Florida venture, Mr. Harrison traveled to the Florida Keys 1-1/2 to 2 days with members of the International Recoveries group. Petitioner did not participate in the group's exploration at sea beyond observing the boats while they were docked. This operation was in progress when petitioner decided to invest; petitioner therefore went to Florida only to observe the operations and speak with the other members of International Recoveries. No treasure or anything of value was recovered as part of the Florida venture. After the unsuccessful Florida operation, petitioner had questions regarding the profitability of this business. Petitioner decided to continue with this venture after discussions with Mr. Tillman.

The International Recoveries group next traveled to Louisiana to search for a sunken galleon called the Palamar. Petitioner invited Mr. Saldivar to join the venture in its search. Mr. Saldivar owned an equipment company in Tucson, Arizona. Petitioner telephoned Mr. Saldivar and asked him to go along on the Louisiana trip in 1989, and Mr. Saldivar agreed to join the expedition. Mr. Saldivar was recruited for this trip because he had the ability to make cages that would protect divers against sharks and other underwater dangers. These metal cages containing the divers would be lowered by crane from the ship. The cost of construction would be paid by petitioner who agreed to reimburse Mr. Saldivar for any expenses incurred in this project. Mr. Saldivar also made an air lift. The air lift

worked like a vacuum cleaner to lift materials from the bottom of the ocean floor onto the deck of the ship. This ship was fully equipped for salvage operations. It was equipped with cranes, hydraulic devices, and diving equipment, as well as other heavy equipment. This ship was obtained from North Sea Underwater Services, Inc. (North Sea), on the recommendation of Mr. Tillman. Petitioner negotiated directly with North Sea's president and attorney in order to procure the ship for the Louisiana operation.

Petitioner knew little about the Palamar beyond its general description as a sunken Spanish galleon. The members of International Recoveries showed petitioner maps showing approximately 10 to 12 sites where galleons had sunk. Petitioner read several books and magazine articles dealing with Spanish galleons.

Petitioner spent only a day and a half on the Louisiana expedition. He was unexpectedly forced to return to Tucson to accompany his wife who had become seriously ill. However, during the expedition, petitioner remained in contact with the group by calling Mr. Saldivar for progress reports one to three times each week. Petitioner also frequently contacted the captain of the ship and Mr. Tillman to determine the progress of the operation. This salvage operation lasted approximately 1 month. No treasure or anything of value was recovered during the Louisiana expedition.

Finally, the International Recoveries group conducted an operation in Goliad, Texas, in the summer of 1989. Petitioner visited Goliad twice to plan the operation prior to any work being commenced. During these planning visits, petitioner discussed the feasibility of the plan with Mr. Tillman. Petitioner went to the Goliad courthouse to examine the title of the property which they wanted to excavate. Subsequently, petitioner met with the owner of the Goliad property to negotiate a contract to obtain permission to enter the land for this operation.

The operation at Goliad took place near the San Antonio River. The excavation lasted approximately 35 to 40 days. Petitioner remained in Goliad throughout the operation. During this time period, petitioner spent 12 hours a night, 3 nights a week, manning the pumps that were being used. Separating the exploration site from the San Antonio River was a bank about 20-feet wide. The exploration site was approximately 300-feet long and 200-feet wide and needed to be excavated to a depth of about 100 feet. In order to pump water out of the excavation site, heavy equipment such as cranes and pumps were used. It took 3 days of running the pumps 24 hours a day to remove all of the water. Once the water was removed, a backhoe was used to remove mud from the hole, then the mud was spread out with a bulldozer to search for artifacts and gold. There were no recreational activities during the business operations. Nothing

of monetary significance was recovered during the Goliad expedition. The few coins that were found by the group were kept by the owner of the land where the dig took place. Petitioner maintained contemporaneous handwritten notes of the expenditures made during the Goliad operation.

In order to get the necessary equipment to and from the work site, petitioner drove a truck round trip, twice, from Tucson, Arizona, to Goliad, Texas. Each trip took approximately 23-1/2 hours each way.

During the remainder of 1989, petitioner and Mr. Saldivar went on occasional treasure hunting trips in Arizona.

Petitioner had wages from his working companies in the amounts of $50,000, $55,000, and $55,000 for 1987, 1988, and 1989 respectively. Even when he was away from home, petitioner stayed in touch with his businesses every day by telephone.

Petitioners claimed losses totaling $201,529 in connection with gold mining and treasure hunting in 1989. Of this amount, $64,877 was claimed on Schedule E in the form of a distributive share of a loss of a partnership called the Kruse Group. In fact, the Kruse Group did not exist as a partnership, and the loss was reported on Schedule E as the result of an error and was meant to be placed on Schedule C.[6]

---

[6] Respondent agreed at trial that all of the losses from
(continued...)

OPINION

## Was the Activity Engaged in for Profit?

The first issue to be decided is whether petitioner's treasure hunting activity was an activity engaged in for profit within the meaning of section 183. This is a factual inquiry requiring a weighing of the evidence in the record.

Respondent asserts that petitioner's treasure hunting activity was not engaged in with the objective of making a profit and that section 183(a) applies. Thus, respondent argues that no deductions attributable to this activity are allowed, except as provided in section 183(b). Petitioners contend that petitioner entered into and carried on the treasure hunting activity with the requisite profit objective and that, as a result, the deductions are allowed under section 162 or section 212.

Section 183(a) provides generally that, if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed except as provided in section 183. Section 183(b) allows deductions in situations not applicable to the instant case.

Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162

---

⁶(...continued)
this activity should have been reported on Schedule C.

[trade or business] or under paragraph (1) or (2) of section 212 [expenses for the production of income]".  For a deduction to be allowed under section 162 or section 212(1) or (2), taxpayers must establish that they engaged in the activity with an actual and honest objective of making an economic profit independent of tax savings.  Antonides v. Commissioner, 91 T.C. 686, 693-694 (1988), affd. 893 F.2d 656 (4th Cir. 1990); Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983).  Their expectation of profit need not have been reasonable; however, they must have entered into the activity, or continued it, with the objective of making a profit.  Hulter v. Commissioner, 91 T.C. 371, 393 (1988); sec. 1.183-2(a), Income Tax Regs.

The burden is on petitioners to show error in respondent's determination that the treasure hunting activity was not engaged in for profit.  Rule 142(a).  Whether the requisite profit objective exists is determined by looking to all the surrounding facts and circumstances.  Keanini v. Commissioner, 94 T.C. 41, 46 (1990); sec. 1.183-2(b), Income Tax Regs.  Greater weight is given to objective facts than to a taxpayer's mere statement of intent.  Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985); sec. 1.183-2(a), Income Tax Regs.

Section 1.183-2(b), Income Tax Regs., provides a list of factors to be considered in the evaluation of a taxpayer's profit

objective: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses from the activity; (7) the amount of occasional profits, if any, from the activity; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. The number of factors for or against the taxpayer is not necessarily determinative, but rather all facts and circumstances must be taken into account, and more weight may be given to some factors than to others. Cf. Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). This list is nonexclusive, and no single factor or even a majority of factors necessarily controls. Abramson v. Commissioner, 86 T.C. 360, 371 (1986); sec. 1.183-2(b), Income Tax Regs.

After weighing all of the objective factors coupled with petitioner's statements of intent, we conclude that petitioner was engaged in the treasure hunting activity for profit. A number of factors indicate that petitioner did have the requisite profit objective.

Respondent places great emphasis on the fact that petitioner did not keep business records for the treasure hunting

operations. Respondent contends that petitioner did, in contrast, maintain thorough business records for his other businesses and that this contrast reveals a lack of a profit motive in the treasure hunting operations. We agree that petitioner's recordkeeping left something to be desired; we do not, however, find that this negates petitioner's profit motive. The treasure hunting activity was different from petitioner's other businesses. Different recordkeeping methods are therefore expected, and lack of recordkeeping is not determinative of intent. Treasure hunting is not the type of business where thorough records of gains and losses are necessary to a successful operation. Cf. Farrell v. Commissioner, T.C. Memo. 1983-542. This type of activity is likely to generate only expenditures with no income until a find is made at which time the income will come in one lump sum. Therefore, we find that petitioner's contemporaneous handwritten lists of expenses were sufficient records for this type of activity.

More indicative of a profit motive is that petitioner did not simply accept the first deal presented to him by International Recoveries. Petitioner testified that the original offer to join this venture was unsatisfactory and that he negotiated for a higher percentage of any treasure that might be recovered in addition to first being reimbursed for his expenses. If petitioner had no expectation of profit, there would have been

no need for him to negotiate a higher percentage of profits plus insist on reimbursement of out-of-pocket expenses before distribution of profits. Petitioner's negotiations indicate a profit motive. See Gefen v. Commissioner, 87 T.C. 1471, 1498 (1986) (partner negotiating terms of partnership's transactions to partnership's best advantage was a factor in deciding that partnership was engaged in activity with the intention of making a profit).

Petitioner was admittedly not an expert in the gold mining and treasure hunting business. However, we find that petitioner did ally himself with experts sufficient to give this venture an opportunity to be successful. Although there were some inconsistencies between petitioner's testimony regarding Mr. Tillman's experience and the summary sheet of Mr. Tillman's experience, we are convinced that petitioner was aware of Mr. Tillman's credentials when making his decision to join International Recoveries in this joint venture. Both petitioner and Mr. Saldivar credibly testified that Mr. Tillman was in charge of the operations, and we are convinced that petitioner reasonably believed that Mr. Tillman was an expert in salvage operations.

Careful investigation of a potential business to insure the best chance for profitability strongly indicates an objective to engage in the activity for profit. Sec. 1.183-2(b)(2), Income

Tax Regs.  While a formal market study is not required, a basic investigation of the factors that would affect profit generally is.  <u>Underwood v. Commissioner</u>, T.C. Memo. 1989-625.  Respondent contends that petitioner did no background investigation to determine if this venture could be profitable or if any of his co-venturers had ever been successful in this type of activity. Petitioner did investigate this venture by meeting with the other investors, investigating Mr. Tillman's credentials, and reading books on treasure hunting.  It is clear from the record that petitioner did not enter this activity with the hope that regular finds of treasure would provide a return of his expenditures plus a small profit.  Instead, petitioner entered this activity with the belief that if treasure were found the return would be so great that all of his expenses would be recouped and a substantial profit would be realized.  This belief indicates that petitioner was engaged in this activity with a profit motive. Cf. sec. 1.183-2(c) <u>Example</u> (<u>6</u>), Income Tax Regs. (wildcat oil driller engaged in activity for profit when there is a small chance to make a large profit).  Thus, the fact that petitioner's co-venturers had not shown a record of profits does not indicate that they did not expect to find gold or treasure in the future.

The factors that most strongly indicate a profit motive are the time and effort spent in conducting the gold mining and treasure hunting as well as the lack of personal enjoyment in

conducting these activities. Petitioner spent a significant amount of time with the gold mining and treasure hunting activity. He was not merely an investor who made an occasional inquiry into the operations; petitioner participated in the daily operations at the Goliad dig, negotiated contracts, arranged equipment rentals, and transported equipment. Additionally, many of the duties performed by petitioner were not activities that would provide personal pleasure or recreation. For the Goliad dig, petitioner drove a truck carrying heavy equipment from Tucson, Arizona, to Goliad, Texas, back and forth twice. Further, petitioner spent 35 to 40 days working long hours each night in Goliad in the middle of the summer watching pumping equipment. Activities of this nature could hardly be called pleasurable. Petitioner performed a sufficient level of hard, tedious labor to convince this Court that his primary objective was to make a profit and that any personal pleasure or recreation was secondary.

A record of substantial losses over several years may be indicative of the absence of a profit motive. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981). Respondent argues that because petitioner never recovered anything of value from mining and salvaging, this weighs against a profit motive. We find this reasoning unpersuasive. If petitioner had engaged in this

activity for a number of years and never recovered anything, then respondent's argument might be more persuasive. A series of losses, if not explainable, may be indicative that the activity is not being engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. However, in the instant case, petitioner entered into the gold mining and treasure hunting activity for 1 year and after not recovering anything of value terminated his relationship with International Recoveries. Petitioner was not willing to continue to suffer substantial losses in a venture that could not be successful; this indicates a profit motive.

Furthermore, while petitioner did have substantial income and net worth, we do not find that this factor indicates that this activity was not engaged in for profit. This activity was not a tax shelter. Cf. Dastgir v. Commissioner, T.C. Memo. 1996-169. Petitioner was able to use the full amount of the losses to offset other income; however, this was clearly not the motivating factor behind this investment. It is unconvincing to argue that petitioner would spend $1 with the objective of saving a portion of that dollar on taxes. "As long as tax rates are less than 100 percent, there is no 'benefit' in losing money." Engdahl v. Commissioner, 72 T.C. 659, 670 (1979). Petitioner in this case incurred losses the old fashioned way--he spent money.

After review of the entire record, we conclude that the treasure hunting activity was not designed to generate tax

benefits nor was it an activity from which petitioner primarily received significant personal pleasure or recreational benefits. We find that it was engaged in for profit within the meaning of section 183.

Passive Loss Limitations

Respondent alternatively argues that even if the activity were engaged in for profit, the losses should be disallowed pursuant to the passive activity loss limitations of section 469. The passive loss rules of section 469 place limitations on the deduction of losses relating to passive activities; namely, from activities in which a taxpayer does not materially participate. Sec. 469(a)(1) and (2), (c)(1), (d)(1).

As a general rule, a taxpayer will be regarded as not materially participating in an activity if the taxpayer is not involved in the operation of the activity on a basis which is regular, continuous, and substantial. Sec. 469(h)(1); sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988).

The temporary regulations under section 469 contain seven tests, the qualification under any one of which will result in a taxpayer's being treated as materially participating in the activity. Sec. 1.469-5T(a), Temporary Income Tax Regs., supra. Of the seven tests, petitioners presented evidence and made general arguments that are applicable only to the tests found in

section 1.469-5T(a)(1), (7), Temporary Income Tax Regs., supra, which provide that a taxpayer shall be treated as materially participating in an activity if he participates in the activity for more than 500 hours during such year, or if, based on all the facts and circumstances, the taxpayer participates in the activity on a regular, continuous, and substantial basis during the taxable year.

A taxpayer may establish the extent of his or her participation in a particular activity by any reasonable means. Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988). The taxpayer has the burden of proving material participation in the activity. Rule 142(a). Petitioner and Mr. Saldivar credibly testified to petitioner's significant level of participation in the treasure hunting and gold mining activity. Petitioner transported heavy equipment twice from Tucson, Arizona, to Goliad, Texas, round trip, which accounts for almost 100 hours. He also operated the tractor and manned the pumps during the night shift throughout the Goliad operation which accounts for approximately 200 hours of participation. Additionally, petitioner negotiated contracts for the venture and purchased equipment to be used in the various operations conducted by the venture. These miscellaneous activities when combined account for, at a minimum, the remaining 200 hours. Although this Court has not always accepted a post-event

narrative of participation, see Speer v. Commissioner, T.C. Memo. 1996-323; Goshorn v. Commissioner, T.C. Memo. 1993-578, we find petitioner's description of his participation, when combined with Mr. Saldivar's testimony and the objective evidence in the record, to be credible, and we therefore conclude that petitioner did materially participate in this activity by participating for over 500 hours during the year.[7]

Rental Loss

Respondent disallowed a loss from petitioners' rental property of $1,978. Except as otherwise provided by statute or by Rule of this Court, the burden of proof is on petitioner to demonstrate that respondent's determination was in error. Rule 142(a). Petitioners have not argued or presented any evidence to dispute respondent's determination with regard to this amount, and therefore petitioners are deemed to have abandoned the issue of whether they are entitled to deduct rental losses of $1,978 in 1989.

Accuracy-Related Penalty

Section 6662 imposes a penalty in an amount equal to 20 percent of any underpayment attributable to, inter alia,

---

[7] Petitioners argue that Mr. Harrison participated in the treasure hunting and gold mining activity for over 1,200 hours. While we accept petitioner's testimony regarding what he did at each of the sites, we did not include all of his activities in determining that petitioner participated for over 500 hours. For example, we did not consider petitioner's walks on the beach during the Florida operation to contribute toward material participation.

negligence or disregard of rules or regulations.  Petitioners have not presented any explanation for their failure to comply with the Code and regulations regarding their rental loss.  The burden rests with petitioner to prove that respondent's determination was in error.  Rule 142(a).  We therefore sustain respondent's determination of the accuracy-related penalty with respect to any underpayment of tax resulting from the disallowance of petitioners' rental loss.  To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.