T.C. Memo. 2014-202

UNITED STATES TAX COURT

SUSAN CRILE, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 9713-10, 29044-11.            Filed October 2, 2014.

<u>Robert H. Baron</u>, <u>Micaela McMurrough</u>, and <u>Megan Y. Lew</u>, for petitioner.

<u>Jane J. Kim</u> and <u>Michael J. De Matos</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>:  Petitioner is an artist and a tenured professor of studio

art.  With respect to her Federal income tax for 2004-2005 and 2007-2009,

[*2] respondent determined deficiencies in tax, accuracy-related penalties under section 6662(a), and additions to tax under section 6651(a)(1) in the following amounts:[1]

| Year | Deficiency | Penalty sec. 6662(a) | Addition to tax sec. 6651(a)(1) |
|------|-----------|---------------------|-------------------------------|
| 2004 | $14,575 | $2,915 | -0- |
| 2005 | 13,865 | 2,773 | -0- |
| 2007 | 22,312 | 4,462 | $574 |
| 2008 | 21,638 | 4,328 | -0- |
| 2009 | 9,254 | 1,851 | -0- |

In support of these determinations respondent relies on two theories. First, he contends that petitioner's activity as an artist is "an activity not engaged in for profit" within the meaning of section 183 and hence that she cannot claim deductions in excess of the income she derived from that activity. Second, if petitioner was engaged in a trade or business during these years, respondent contends that many of the deductions she claimed are not, within the meaning of section 162(a), "ordinary and necessary expenses" incurred in carrying on that business.

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code in effect for the tax years in issue. We round all monetary amounts to the nearest dollar.

**[\*3]**  At the close of trial, the Court ordered the cases bifurcated for purposes of briefing and opinion.  This opinion addresses the first of respondent's theories and concludes that petitioner during the years in issue was engaged in a "trade or business" with the objective of making a profit from her activity as an artist.  Respondent's contentions concerning the substantiation of her expenses, the character of those expenses as "ordinary and necessary," and her liability for penalties and additions to tax will be resolved in due course.

FINDINGS OF FACT

The parties filed stipulations of facts with accompanying exhibits that are incorporated by this reference.  Petitioner resided in New York when she petitioned this Court.

A.    Petitioner's Career as an Artist

Petitioner has had a long, varied, and distinguished career as an artist.  She has worked for more than 40 years in media that include oil, acrylic, charcoal, pastels, printmaking, lithograph, woodcut, and silkscreen.  She has exhibited and sold her art through leading galleries; she has received numerous professional accolades, residencies, and fellowships; and she is a full-time tenured professor of studio art at Hunter College in New York City.  Respondent agrees that petitioner has been a successful, though rarely a profitable, artist.

**[*4]**   During the academic year petitioner devotes roughly 30 hours per week to her art, working mainly at a small studio in her Manhattan apartment.  During the summer, she works full time on her art business at a larger studio in upstate New York.  The amount of time it takes petitioner to create a finished work of art varies greatly--from one week to two years--depending on its size and complexity.  During her career petitioner has created more than 2,000 pieces of art.

Petitioner's artwork hangs in the permanent collections of at least 25 museums.  These include the Metropolitan Museum of Art, the Guggenheim Museum, the Brooklyn Museum of Art, the Phillips Collection, the Hirshhorn Museum, and art museums at eight colleges and universities.  Museums have a rigorous vetting process for acquiring art.  Museum acquisitions boost an artist's reputation in the eyes of collectors and may contribute to price increases for the artist's other works.

Petitioner's artwork has been acquired by for-profit as well as nonprofit entities.  Corporations that have purchased petitioner's art (several of which have since merged) include AT&T, Exxon, Texaco, Standard Oil of Ohio, Bank of America, Chase Manhattan Bank, Chemical Bank, Charles Schwab, General Mills, Westinghouse, General Telephone & Electronics, Frito-Lay, Cigna, and Prudential.  Her works hang in the collections of six major New York law firms.  Govern-

[*5] mental entities that have acquired her art include the Federal Reserve Board, the Library of Congress, and the State Department (for display in U.S. embassies abroad). Such acquisitions, like museum acquisitions, place a "seal of approval" on an artist's works and have the potential to make them more attractive to private collectors.

Petitioner has been represented during her career by at least five New York art galleries, including the Kornblee Gallery, the Fischbach Gallery, the Droll/-Kolbert Gallery, and the Graham Gallery. In 2004 petitioner switched from the Graham Gallery to Michael Steinberg Fine Art, believing that the latter's client base would enable her to increase sales of her artwork. She was represented by Michael Steinberg Fine Art until 2009, when it went out of business during the financial crisis. Petitioner has had affiliations with other art dealers and print publishers that have also sold her work.

Petitioner has received recognition from prestigious arts organizations, both public and private. She has received two awards from the National Endowment for the Arts (NEA)--a $25,000 award for painting in 1982 and a $15,000 award for drawing in 1989. Petitioner has served on NEA panels to select award recipients, and she has been interviewed by the Smithsonian Institution as part of its Archives of American Art oral history project. During 2003 she was a member of the

[*6] admissions panel for the visual arts at the American Academy in Rome and at the Ranieri Foundation in Civitella, Italy.

"Residencies" are awarded by arts organizations to enable artists to focus on their work without distractions, in an environment conducive to artistic stimulation and productivity. Institutions that have awarded residencies to petitioner include the MacDowell Colony in 1972, the American Academy in Rome in 1990, the Rockefeller Foundation Bellagio Center in 2007, and Yaddo in 1970, 1971, 1973, 1975, 2000-2003, 2005, 2006 and 2009.

Petitioner's work has been reviewed on many occasions by leading art critics. Her first review in the New York Times, appearing in 1971, was written by Hilton Kramer, one of the foremost art critics of his era. Her work was reviewed in the New York Times on 17 subsequent occasions by Mr. Kramer and his successors. Other publications that have reviewed her work include the Boston Globe, Houston Chronicle, Houston Post, Los Angeles Times, St. Louis Post-Dispatch, and New York Magazine. Her work has been reviewed by every major art publication in the United States, including ARTNews, Art in America, ArtForum, Flash Art, and American Artist.

Petitioner performs considerable research in connection with her art, sometimes involving international travel under difficult conditions. During the first

[*7] Gulf War she painted a series entitled "Fires of War," which enjoyed considerable critical and commercial success. To secure documentation for these works, she traveled to Kuwait and accompanied firefighters to burning oil fields. As she described it, the environment in Kuwait in the wake of Saddam Hussein's retreating forces was "virtually a land of fire; black overhead smoke. It looked like night in day; the desert [was] covered with tar and lakes of oil." Works from petitioner's "Fires of War" series were exhibited in Kuwait and were acquired by the Government of Kuwait.

B.     Petitioner's Projects During the Years in Issue

During 2004-2009 petitioner worked on five main projects. The first, a series of works titled "Assisi," was based on Giotto's paintings of the life of Saint Francis in the Basilica di San Francesco in Assisi, Italy. Petitioner had an exhibition of these works in 2004 at the Graham Gallery.

Petitioner's second major project was a series titled "Abu Ghraib," based on events that occurred at the Abu Ghraib prison during the Iraq War. Petitioner did considerable research in connection with "Abu Ghraib," including interviews with journalists who had reported from the war zone. Works from "Abu Ghraib" were exhibited in 2006 at the Bertha and Karl Leubsdorf Art Gallery at Hunter College.

**[*8]** This exhibit was reviewed in the Financial Times, the New York Times, and the Newark Star-Ledger.

Petitioner continued her work on "Abu Ghraib," on both the production and the marketing side, during 2007. She worked on this series during her residency at the Rockefeller Foundation Bellagio Center in summer 2007, and later that year she had two exhibitions of "Abu Ghraib" in Italy. The first was in Rome, and petitioner returned to Italy to oversee installation of the artwork and production of the exhibition catalog. The second exhibition of "Abu Ghraib," in Venice, opened in November 2007. Petitioner took part in managing the installation and attended the opening.

Petitioner's third major project during 2004-2009 was "Printing on Silk." This project involved designing and printing patterns on silks using woodblocks or silkscreen, which petitioner created in a factory outside Calcutta, India. Petitioner had not previously done substantial work in these media. She embarked on this project when colleagues recommended that she expand the market for her work by producing images on silk. The "Printing on Silk" project required hands-on oversight of expert craftsmen at the factory in rural India. Petitioner's final two projects during the years in issue, each in its startup phase, involved a series of

**[*9]** small abstract paintings and a project focused on prisoners detained in Guantanamo Bay.

C.     Petitioner's Business Practices

Petitioner actively marketed her artwork during the tax years at issue.  She was represented by galleries throughout this period until Michael Steinberg Fine Art folded in 2009.  When an artist is represented by a gallery, the gallery plays a large marketing role by exhibiting the artist's work and by hosting openings, client receptions, and similar events.  Petitioner supplemented the galleries' efforts by sending exhibition announcements and other promotional materials to her mailing list of nearly 3,000 collectors.  Petitioner regularly attended art-related events to network with collectors, journalists, and art professionals.  Since 2002 petitioner has marketed her art through a Web site that features images of selected works, her biography, and publications about her artwork and career.  She has received inquiries from potential collectors through the Web site.

Petitioner's career spans four decades, and she has carefully documented her extensive inventory of artwork.  Early in her career she used a system commonly employed by libraries at the time--a card catalog system.  Petitioner used index cards to record relevant information about each work, including its title, medium, dimensions, exhibition history, original asking price, and (if the work was sold)

**[\*10]** the gallery commission.  These index cards were complemented by slides created by professional photographers of each work.  Before the advent of digital images, petitioner promoted her art by mailing slides of her works to collectors, galleries, and museum curators.

Petitioner's sales records are generally accurate but sometimes incomplete.  She retains all price lists created by galleries in connection with her exhibitions.  These price lists include the title, medium, dimensions, and asking price for each exhibited work.  As her works sold in later years, petitioner annotated these lists and the associated index cards with information about those sales.

Maintaining perfect sales records was difficult because galleries often neglected to provide her with all relevant sales information.  In some cases she received a single check accompanied by a list of pieces sold, without specification of the purchaser's identity or the sale price of each individual work.  Ascertaining the purchaser's identity was important because petitioner regarded each purchaser as a potential future customer.  When petitioner received incomplete information, she contacted the gallery in an effort to obtain all relevant sales data.  Such efforts were not always successful and, for that reason, petitioner's sales records are not 100% accurate.

[*11] More recently petitioner has switched to a digital recordkeeping system. Each new piece of art is entered into a digital database that contains substantially the same information as her index cards. Petitioner is in the process of moving the information on the index cards to the digital database. Given the extent of her inventory, this process is time consuming. Because petitioner has little familiarity with electronic media, she has hired assistants to help her with this.

Petitioner keeps records of all invoices related to her art business and all receipts for business and personal expenses. During four of the five years at issue, petitioner hired a bookkeeper to assist her. Her standard practice was to provide her bookkeeper with invoices, receipts, and annotated bank and credit card statements. The bookkeeper then put this information into a Quicken program and provided the Quicken files to petitioner's accountant, who prepared her tax returns.

D.    Petitioner's Sales of Artwork

Petitioner has generated substantial income from sales of her artwork. Respondent stipulated that the total value of works sold during her career is at least $937,150. Galleries usually took a 50% commission, and petitioner on several occasions received no proceeds at all because of financial distress or mis-

[*12] management on the gallery's part.[2]  Respondent stipulated that, after taking account of these reductions, petitioner received gross income of at least $537,902 from the sale of 261 works between 1971 and 2013.

The evidence at trial established that petitioner sold an additional 95 works between 1971 and 2004.  For 53 of these works, respondent stipulated the gallery's asking price but declined to stipulate the proceeds petitioner received.  After listening to the trial testimony and reviewing the exhibits, the Court concludes that the galleries sold these 53 works at or close to their asking prices and realized proceeds of approximately $180,000.  Netting out the normal 50% commission, the Court finds that petitioner earned income of approximately $90,000 from sales of these 53 works.

For the 42 remaining works, respondent declined to stipulate either the gallery's asking price or the proceeds petitioner received.  For these works, most of which were sold before 1992, petitioner estimated their asking prices on the basis of sales records for similar works offered for sale at about the same time.  After listening to the trial testimony and reviewing the exhibits, the Court con-

---

[2]For example, petitioner had a solo exhibition of ten abstract paintings at Michael Steinberg Fine Art in 2009.  Each painting was priced at $1,800 and all ten were sold.  Petitioner never received payment for these works when the gallery closed during the financial crisis.

[*13] cludes that the galleries sold these 42 works at or close to their estimated asking prices and realized proceeds of approximately $80,000.  Netting out the normal 50% commission, the Court finds that petitioner earned income of approximately $40,000 from sales of these 42 works.

All in all, the Court finds that petitioner sold, directly or through galleries, a total of 356 works of art during 1971-2013.  These sales generated gross proceeds of approximately $1,197,150.  After subtracting gallery commissions and other reductions, petitioner earned income of approximately $667,902 from sales of her art during these years.

Petitioner's best year was 1995, when she reported gross receipts of $111,815 from sales of her art.  Her best recent year was 2013, when she earned $75,000 from sales of her art.  Despite substantial gross receipts, petitioner has never reported a net profit from her art business.  For 1995 she reported a profit of $34,204 on her Schedule C, Profit or Loss From Business, but this was offset by a net operating loss carryforward.  Petitioner had not filed her 2013 tax return at the time of trial, but she expected to report a net profit for that year.

E.    Petitioner's Teaching Career

Petitioner practiced as an artist for a decade before she began teaching, and it was her achievements as an artist that resulted in her securing a teaching posi-

**[\*14]** tion. From 1983 to 1989 petitioner served as a visiting assistant professor, and subsequently as a substitute assistant professor, in the Department of Art and Art History at Hunter College in New York City. She obtained full-time employment there as an Associate Professor in 1989, and she received tenure in 1994. In 1996 she became a full professor at Hunter College and continues to hold that position today. During the tax years at issue she earned between $85,999 and $106,058 annually from her teaching position.

Hunter College's studio art department has a strong reputation and is in the top tier of master of fine arts programs. It was one of the first art departments to hire professional, working artists as teachers, and the market for securing a faculty position there is extremely competitive. Successful candidates for hiring, promotion, and tenure must demonstrate significant accomplishment in creative activity, effective teaching ability, and commitment to the academic community by serving on committees and advising students.

To be promoted and gain tenure, a studio artist must exhibit art; the sale of art is not required. There is an expectation that a professor, once tenured, will continue to make and exhibit art. However, a tenured professor is no longer subject to annual performance evaluations, and the expectation to exhibit art is not

[*15] rigorously enforced. Petitioner plans to continue her art business following her retirement from Hunter College.

F.    Expert Testimony

1.    Robert Storr

Petitioner offered, and the Court recognized, Robert Storr as an expert on industry practice in the fine arts community. He is the dean of the Yale School of Art and a professor of painting and printmaking, positions he has held since 2006. From 1990 to 2002 he was curator, and later senior curator, at the Museum of Modern Art. He has more than 30 years of experience in the art field.

Dean Storr credibly testified about factors that influence the price of an artist's work. Art prices are influenced by many factors, such as the artist's exhibition history, noteworthy reviews, awards, and other accolades. As an artist gains greater exposure and her career develops, prices for that artist's works will normally increase. Significant events in an artist's career can drive prices higher. Such events can include a solo show, a museum's acquisition of the artist's work, an exhibition at a major international art fair, or an important critical review. Relatively few artists have steady, consistent sales from year to year or decade to decade. Artists often experience income instability and many find it necessary to have another job with reliable income.

[*16]      2.      Renato Danese

Petitioner offered, and the Court recognized, Renato Danese as an expert on industry practice in the fine arts community.  Mr. Danese is the owner of Danese Corey (formerly Danese), an art gallery in New York City.  His gallery, which he has owned since 1996, currently represents about 30 artists.  He has worked with hundreds of artists during his 40-year career as a curator, gallery director, and art dealer.  From 1971 to 1978 Mr. Danese was Associate Director of the Visual Arts Program at the NEA in Washington, D.C.

Mr. Danese credibly testified that gallery representation is important to an artist's career because galleries increase the artist's visibility and exposure, which in turn should increase her prices and sales.  Gallery representation is also desirable because it helps add stability to an artist's career.  Galleries are businesses and want to represent artists who have, or have the potential to develop, successful professional careers.

Mr. Danese also testified about factors that influence art prices.  Factors that help increase the value of an artist's work include museum and collector support, critical acclaim, and public awareness.  An award from the NEA has the potential to increase an artist's prices because it "is a sign of serious recognition." An NEA

[*17] award enhances an artist's credentials and professional stature and may boost his or her potential for a financially profitable career.

Mr. Danese also opined that it is common for artists to have years in which they earn little or no income from selling artwork. Artists often experience cycles of achievement and financial success, and their income may fluctuate over the course of months or years. It is very difficult to predict when success will occur in the art world.

### 3. Barbara Sussman

Petitioner offered, and the Court recognized, Barbara Sussman as an expert on art framing, handling, storage, and labeling. Ms. Sussman is an art appraiser, art consultant, and art framer with 30 years of experience in these fields. As an art consultant, she manages the collections of numerous corporate clients, overseeing the purchase, shipping, framing, installation, and inventorying of thousands of pieces of art.

Ms. Sussman visited petitioner's studios in New York City and upstate New York to inspect her artwork and assess her inventory and storage practices. Petitioner keeps a logbook at the entry of her storage areas showing the location of each work. The storage areas are temperature controlled properly. Most of petitioner's paintings are on canvasses with stretchers; these allow the canvas to be

**[*18]** tightened and prevent it from warping. Consistently with standard art practice, the back of each work is inscribed with petitioner's signature, the medium, and the date and year of execution. Works in transit or scheduled for shipment were professionally wrapped using standard materials. Ms. Sussman concluded that petitioner's recordkeeping practices and her methods of labeling and storage indicate "that she is a professional in the business of selling and/or attempting to sell her art."

   4.  <u>Elizabeth von Habsburg</u>

Respondent offered, and the Court recognized, Elizabeth von Habsburg as an expert in the art market and art appraisal. Ms. von Habsburg is the managing director of Winston Art Group. She advises private clients on the purchase, sale, and maintenance of their collections.

According to Ms. von Habsburg, the art industry considers the following factors in determining an artist's commercial viability: (1) a vibrant market for the artist's work as evidenced by sales through dealers, public auctions, and private transactions; (2) clearly detailed and accurate recordkeeping; (3) an increasing trend of income over the years; and (4) increasing price levels for the artist's works. Ms. von Habsburg noted that petitioner had been represented by major New York galleries for most of her career, but that she ceased to be represented in

**[\*19]** 2009 when Michael Steinberg Fine Art closed. Petitioner's artwork was sold very few times at auction. In Ms. von Habsburg's view, petitioner's records were not always complete and included some inconsistent data.

According to Ms. von Habsburg's calculations, petitioner during 2004-2009 received aggregate net proceeds of $15,740 from sales of her art, and she sold an additional 13 pieces for which she should have received $17,250, but for which she had not been paid. During 2000-2013, petitioner received, according to Ms. von Habsburg, average annual net proceeds of $9,980 from sales of her art. From the beginning of her career through 2013, petitioner received, according to Ms. von Habsburg, average annual net proceeds of approximately $17,000 from sales of her art.

To gauge whether market prices for petitioner's works had increased during her career, Ms. von Habsburg examined the prices paid for petitioner's oil paintings. The average net price varied from zero for years in which no oil painting was sold to a high of $29,933 in 1995. Excluding years in which no oils were sold and the supposed "outlier year" of 1995, Ms. von Habsburg concluded that the average net price per oil did not trend upward but stayed within a range of $1,825 to $9,000 from 1971 through 2013. Ms. von Habsburg acknowledged that she had not viewed any of these works in person.

[*20] Taking into account the relatively small number of works sold per year, petitioner's modest annual net income from sales, the supposed lack of a steady upward trend in sale prices, and the absence of current dealer representation, Ms. von Habsburg found it "possible [to] conclude that there is a limited commercial market for the works by Susan Crile." Ms. von Habsburg does not opine that petitioner's works have no market, that petitioner is not a successful artist, or that petitioner lacks a profit motive. Rather, Ms. von Habsburg concludes, on the basis of sales history and other factors that she identified, that there appears to be a limited commercial market for petitioner's works.

G.    Petitioner's Tax Returns

Petitioner filed Federal income tax returns for all years in issue. On those returns she reported wage income between $85,999 and $106,058, and she reported other taxable income (interest, dividends, capital gains, pensions, and Social Security payments) between $17,658 and $67,046. On her Schedules C, she reported income and claimed the following expenses as deductions in connection with her activity as an artist during the years at issue:

|  | 2004 | 2005 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| Gross receipts | $3,990 | $3,600 | $1,750 | -0- | $6,525 |
| Cost of goods | 8,119 | -0- | -0- | -0- | -0- |
| Advertising | -0- | -0- | 261 | $ 921 | -0- |

| [*21] | | | | | |
|---|---|---|---|---|---|
| Vehicle | 3,268 | 6,184 | 3,104 | 2,312 | 3,200 |
| Depreciation | 3,592 | 6,169 | 3,601 | 5,976 | 3,991 |
| Insurance | 50 | 500 | 230 | 416 | 560 |
| Mortgage | 3,343 | 3,281 | 3,198 | 3,422 | 2,204 |
| Legal | 1,050 | 1,718 | 9,321 | 7,655 | 5,628 |
| Office | 2,124 | 626 | 475 | 690 | 619 |
| Repair | 3,802 | 2,543 | 1,230 | 1,051 | 1,000 |
| Supplies | 227 | 3,111 | 6,127 | 5,793 | 4,654 |
| Taxes | 5,123 | 5,231 | 4,875 | 4,688 | 4,698 |
| Travel | 6,167 | 3,237 | 10,535 | 8,018 | 3,076 |
| Meals/Ent. | 3,049 | 3,413 | 2,631 | 4,042 | 2,761 |
| Utilities | 5,748 | 3,984 | 5,496 | 5,756 | 4,370 |
| Research | 3,478 | 3,439 | 2,961 | 3,849 | 3,223 |
| Maintenance | 3,284 | 2,775 | 1,972 | 3,213 | (864) |
| Photography | 716 | 2,440 | -0- | -0- | -0- |
| Local transp. | 2,218 | 2,400 | 1,394 | 1,540 | 1,360 |
| Dues/Pubs. | 694 | 100 | 285 | -0- | -0- |
| Art expenses | 2,895 | -0- | 206 | 1,310 | 26 |
| Services | 2,395 | 575 | 2,460 | 500 | 1,246 |
| Gratuities | 565 | 800 | -0- | -0- | -0- |
| Freight | 1,471 | -0- | 1,111 | 1,387 | 451 |
| Business gifts | 239 | 161 | 596 | 504 | 1,235 |
| Studies | -0- | 700 | 825 | -0- | -0- |
| Bank charges | -0- | -0- | 206 | 228 | 163 |
| Total expense | 63,617 | 53,387 | 63,100 | 63,271 | 43,601 |
| Gain/Loss | (59,627) | (49,787) | (61,350) | (63,271) | (37,076) |

[*22] Petitioner's theory for claiming deductions seems to have been that most experiences an artist has may contribute to her art and that most people with whom an artist socializes may become customers or otherwise advance her career. The trial established that a significant number of the deductions she claimed were not, within the meaning of section 162(a), "ordinary and necessary expenses" of conducting her art business but were "personal, living, or family expenses" non-deductible under section 262(a). The latter expenses appear to have included telephone and cable television bills, newspaper and magazine subscriptions, gratuities to doormen in her apartment building, taxicabs to the opera, museums, and social events, restaurant meals with friends and acquaintances, and international travel to gain inspiration from paintings in European museums. We have deferred to another day the calibration of petitioner's deductible business expenses. But it was clear to the Court that the economic losses she actually sustained in her art business were substantially smaller than the tax losses reported on her Schedules C, owing to the inclusion of many personal expenses when calculating her business income.

**[*23]**                                  OPINION

I.     Governing Statutory Framework

Section 162(a) allows as a deduction "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." To be entitled to deductions under this section, the taxpayer must show that she engaged in the activity with an actual and honest objective of making a profit. Hulter v. Commissioner, 91 T.C. 371, 392 (1988). If an activity is not engaged in for profit, no deduction attributable to it is allowed except to the extent of gross income derived therefrom (reduced by deductions allowable without regard to whether the activity was engaged in for profit). Sec. 183(b). Thus, losses are not allowable for an activity that a taxpayer carries on primarily for sport, as a hobby, or for recreation. Sec. 1.183-2(a), Income Tax Regs.

Petitioner bears the burden of proving that she conducted her art business with a predominant, primary, or principal objective of earning a profit. Giles v. Commissioner, T.C. Memo. 2005-28, 89 T.C.M. (CCH) 770, 775. However, "a reasonable expectation of profit is not required." Sec. 1.183-2(a), Income Tax Regs. We determine whether the taxpayer has the requisite intent to earn a profit on the basis of all surrounding facts and circumstances. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir.

[*24] 1981); sec. 1.183-2(b), Income Tax Regs. In making this determination, greater weight is accorded to objective facts than to the taxpayer's subjective statement of intent. Keanini v. Commissioner, 94 T.C. 41, 46 (1990); sec. 1.183-2(a), Income Tax Regs.; see Indep. Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 726 (9th Cir. 1986), aff'g Lahr v. Commissioner, T.C. Memo. 1984-472.

II.    Scope of the Activity

The regulations specify that, in determining whether section 183 applies for a particular activity, a threshold determination must be made as to the scope of that activity. Sec. 1.183-1(d)(1), Income Tax Regs. The "activity" to be considered under section 183 may encompass a single undertaking or multiple undertakings. In ascertaining whether multiple undertakings constitute a single activity, all the facts and circumstances are taken into account. Significant facts include: (1) the degree of organizational and economic interrelationship of various undertakings; (2) the business purpose which is (or might be) served by carrying on the various undertakings separately or together; and (3) the similarity of various undertakings. Sec. 1.183-1(d)(1), Income Tax Regs.; see, e.g., Keanini, 94 T.C. at 46; Mitchell v. Commissioner, T.C. Memo. 2006-145, 92 T.C.M. (CCH) 17, 19 (noting other relevant factors).

**[*25]** Respondent argues that, "[p]reliminarily, it is necessary to define Ms. Crile's 'activity' per Treas. Reg. § 1.183-1(d)(1)." Respondent contends that "[p]etitioner's bifurcation of her art activity as an 'artist' separate from that of 'artist professor' for Hunter College is artificial and is not supported by the facts and circumstances of this case." It is undisputed that petitioner's activity as a professor is a "trade or business." Thus, the thrust of respondent's "single activity" argument is that petitioner must claim her art-related expenses, not as business expenses on Schedule C, but rather as unreimbursed employee business expenses on Schedule A, Itemized Deductions. As such, they would be subject to the floor created by sections 62(a) and 67(a) and to adverse alternative minimum tax consequences. See Ruggiero v. Commissioner, T.C. Memo. 1997-423, 74 T.C.M. (CCH) 662, 667 n.10.[3]

---

[3]Noting that respondent in his pretrial memorandum did not explicitly advance a "single activity" argument under section 1.183-1(d), Income Tax Regs., petitioner contends that it would prejudice her if we considered it. At trial, especially during his examination of the Hunter College witnesses, respondent explored the relationship between petitioner's activity as an artist and her job requirements as a professor. The clear thrust of respondent's examination was the notion that petitioner worked as an artist in order to keep her job as a teacher. We conclude that petitioner had adequate notice of respondent's theory and that the trial provided a sufficient evidentiary foundation to enable both parties to address the "single activity" argument in their post-trial briefs.

**[\*26]** We conclude that petitioner's art business and her salaried position as a professor constitute two distinct activities. The regulations provide that the IRS will generally "accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities." Sec. 1.183-1(d)(1), Income Tax Regs. The taxpayer's characterization will be rejected only where it "is artificial and cannot be reasonably supported under the facts and circumstances of the case."

We do not find petitioner's characterization to be "artificial" in any sense of the word. Petitioner practiced as an artist for a decade before she began teaching and for 25 years before she became a tenured full professor. For any practitioner who teaches--whether a lawyer, an accountant, an economist, or an artist--there is an obvious intersection between the individual's profession and his or her teaching. But the two activities have different job requirements and entail different skills.

As a professor, petitioner was expected or required (among other things) to exhibit her art; evaluate students' work; create course syllabi; provide career counseling; and serve on faculty committees. As an artist, petitioner was required (among other things) to exhibit and sell her art; manage relationships with galleries; network with collectors, journalists, and museum curators; maintain records

[*27] of income and expenses; manage her art inventory; and maintain an electronic database of her works. The trial established that Hunter College required or expected its art professors to exhibit their work; it did not require that they actually sell art. Many of the marketing and related business activities in which petitioner engaged were thus irrelevant to her teaching career.

Respondent has not explained why petitioner would devote many hours to these tasks--some of them tedious or unpleasant--if her sole goal were to retain her teaching position. Indeed, during the tax years at issue petitioner was, and for the previous ten years had been, a tenured professor. Tenured professors were not subject to annual performance evaluations, and for them the requirement to exhibit art was at most an expectation that was not rigorously enforced.

Petitioner devotes hundreds of hours a year to administrative aspects of her art business that are unrelated to her job requirements at Hunter College. She was a successful artist for over a decade before she began teaching at Hunter College and she plans to continue her art business after she retires from teaching. On the record before us, we find that petitioner's activity as an artist is a separate activity from her career as a teacher and must be analyzed separately under section 183.

**[\*28]** III.     <u>Intent to Earn a Profit</u>

The regulations set forth a nonexclusive list of nine factors relevant in ascertaining whether the taxpayer conducted an activity with the intent to earn a profit.  They are:  (1) the manner in which the taxpayer conducts the activity; (2) the expertise of the taxpayer or her advisers; (3) the time and effort spent by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.  Sec. 1.183-2(b), Income Tax Regs.

No factor or group of factors is controlling, nor is it necessary that a majority of factors point to one outcome.  See <u>Keating v. Commissioner</u>, 544 F.3d 900, 904 (8th Cir. 2008), <u>aff'g</u> T.C. Memo. 2007-309; <u>Engdahl v. Commissioner</u>, 72 T.C. 659, 666 (1979) (taxpayer's profit motive must be ascertained "not on the basis of any one factor but on the basis of all the facts and circumstances"); sec. 1.183-2(b), Income Tax Regs.  Certain factors may be accorded more weight in a particular case because they have greater salience or persuasive value as applied to its facts.  See <u>Vitale v. Commissioner</u>, T.C. Memo. 1999-131, 77 T.C.M. (CCH)

**[*29]** 1869, 1874, <u>aff'd without published opinion</u>, 217 F.3d 843 (4th Cir. 2000); <u>Green v. Commissioner</u>, T.C. Memo. 1989-436, 57 T.C.M. (CCH) 1333, 1343 (noting that all nine factors do not necessarily apply in every case).

1.    <u>Manner in Which Activity Is Conducted</u>

Conducting an activity in a businesslike manner may show that the taxpayer intends to earn a profit from it.  Sec. 1.183-2(b)(1), Income Tax Regs.  Facts evidencing a businesslike manner include (among other things) the taxpayer's maintenance of complete and accurate books and records; the taxpayer's conduct of the activity in a manner resembling that in which successful practitioners conduct similar business activities; and the taxpayer's change of operating procedures, adoption of new techniques, or abandonment of unprofitable activities in a manner consistent with a desire to improve profitability.  <u>Giles v. Commissioner</u>, T.C. Memo. 2006-15; sec. 1.183-2(b)(1), Income Tax Regs.

In order to demonstrate a profit motive, a taxpayer need not keep records of the sort maintained by a Fortune 500 company.  In many situations, informal recordkeeping is sufficient.  <u>See, e.g.</u>, <u>Burrus v. Commissioner</u>, T.C. Memo. 2003-285, 86 T.C.M. (CCH) 429, 435-437 (cattle activity); <u>Fields v. Commissioner</u>, T.C. Memo. 1981-550, 42 T.C.M. (CCH) 1220, 1225 (same); <u>Edge v. Commissioner</u>, T.C. Memo. 1973-274, 32 T.C.M. (CCH) 1291, 1298 (farming);

[*30] <u>Farrell v. Commissioner</u>, T.C. Memo. 1983-542, 46 T.C.M. (CCH) 1290, 1295 (same); <u>Harrison v. Commissioner</u>, T .C. Memo. 1996-509, 72 T.C.M. (CCH) 1258, 1262 (gold mining and treasure salvaging activity).  For creative artists in particular, our precedents indicate that the recordkeeping required to evidence a profit motive is not rigorous.

In <u>Churchman v. Commissioner</u>, 68 T.C. 696 (1977), we held that a taxpayer who had been involved in art activities for 20 years had a profit motive.  The taxpayer kept all receipts of her art-related expenses and kept a journal recording what works she had sold and to whom.  The Court found that her recordkeeping was sufficient to show that she conducted her art activity in a businesslike manner even though she "did not keep a complete set of books pertaining to her artistic activities." <u>Id.</u> at 702.[4]

Petitioner kept records that are substantially similar to, and in most respects superior to, those maintained by the taxpayer in <u>Churchman</u>.  Petitioner kept all original receipts and invoices related to her art business.  She kept detailed and relatively accurate records, going back to 1971, of sales of her artwork, including

---

[4]In other contexts as well, we have noted that the absence of complete books and records does not conclusively establish the lack of a profit objective.  <u>See, e.g.</u>, <u>Foster v. Commissioner</u>, T.C. Memo. 2012-207, slip op. at 14 (citing <u>De Boer v. Commissioner</u>, T.C. Memo. 1996-174, 71 T.C.M. (CCH) 2730, 2736); <u>Weller v. Commissioner</u>, T.C. Memo. 2011-224; <u>Farrell</u>, 46 T.C.M. (CCH) at 1295.

**[\*31]** the sale price and the identity of the buyer. Her sales records were not complete, but these lapses were often due to circumstances beyond her control, such as galleries' failures to provide relevant data. Petitioner hired a bookkeeper during four of the five years at issue who put her expenses into a Quicken program, which was supplied to her accountant. While it does not appear that petitioner used her records for the purpose of controlling costs, she did use them for purposes of marketing her works to collectors, galleries, and museum curators.

Although petitioner did not have a written business plan, she had a business plan and she pursued it consistently. See Phillips v. Commissioner, T.C. Memo. 1997-128, 73 T.C.M. (CCH) 2296, 2300 (written financial plan not required for 32-horse farm where business plan was evidenced by action); Burrus v. Commissioner, T.C. Memo. 2003-285. A taxpayer need not conduct a formal marketing study in order to have a profit motive. See Burger v. Commissioner, 809 F.2d 355, 359 n.6 (7th Cir. 1987), aff'g T.C. Memo. 1985-523; Engdahl, 72 T.C. at 668. Petitioner understood the general factors that affect the pricing of art --a history of sales, gallery representation, solo exhibits, positive critical reviews, and prestigious awards, fellowships, and residences. She then worked to enhance her credentials and professional stature in each of these respects, in an effort to increase the value of her art.

[*32] An important element of a business plan involves marketing and advertising. See McKeever v. Commissioner, T.C. Memo. 2000-288 (failure to advertise showed lack of profit motive). Using different forms of advertising may allow taxpayers "to expand their potential market" and "reach[] previously untapped audiences." Cohn v. Commissioner, T.C. Memo. 1983-301, 46 T.C.M. (CCH) 286, 292, aff'd without published opinion, 742 F.2d 1432 (2d Cir. 1984). In Churchman, 68 T.C. at 702, we found it significant that the taxpayer marketed her art by seeking gallery representation and by sending announcements about exhibitions to 200 individuals on her mailing list. See Waitzkin v. Commissioner, T.C. Memo. 1992-216, 63 T.C.M. (CCH) 2740, 2745 (1992) (noting importance of gallery representation to an artist). In Storey v. Commissioner, T.C. Memo. 2012-115, 103 T.C.M. (CCH) 1631, 1637, we held that a filmmaker evidenced a businesslike manner by making and distributing a trailer, creating a Web site and blog, hiring a marketing firm, and using social networks.

Petitioner's marketing efforts demonstrate a profit objective. Until Michael Steinberg Fine Art closed during the financial crisis, she was represented by a gallery throughout the period at issue. This is critically important in assessing profit motive, because it demonstrates that petitioner conducted her activity in the same manner as other successful artists. See Churchman, 68 T.C. at 702;

[*33] Waitzkin, 63 T.C.M. (CCH) at 2745. Like the taxpayer in Churchman, petitioner sent exhibition announcements to her mailing list of 3,000 collectors. She attended art-related events to network with art professionals and, like the taxpayer in Storey, she maintained a Web site to promote her art.

Petitioner treated other aspects of her art business in a professional manner. Like the taxpayer in Churchman, 68 T.C. at 703, she had a "relatively large inventory" and kept track of her artwork efficiently. Her catalog included information about each work, including the title, dimension, media, exhibition history, asking price, gallery commission, and a digital or film image of the piece. As Ms. Sussman credibly testified, petitioner's paintings were mounted on stretchers, stored in climate-controlled conditions, and professionally packaged for shipment. All of this shows that petitioner conducted her art business in the same manner as successful practitioners of her craft.

A taxpayer's change of operating methods, adoption of new techniques, or abandonment of unprofitable activities may indicate a profit objective. Sec. 1.183-2(b)(1), Income Tax Regs.; see also Golanty, 72 T.C. at 430-431. Before 2004 petitioner was represented by the Graham Gallery. Although she had several exhibitions there, she regarded the other artists that it exhibited as "conservative" in style. Because she thought that the Graham Gallery was not attracting the types of

[*34] collectors who would be interested in her work, she switched in 2004 to Michael Steinberg Fine Art in the hope that her sales would improve. Petitioner likewise embarked in a new direction during 2004-2009 with her "Printing on Silk" project in India. She undertook this project when colleagues suggested that she expand the market for her work by producing images on silk.

All in all, we conclude that petitioner conducted her art activity in a businesslike manner. All of the elements we have discussed, except her failure to use expense records to reduce losses, indicate that she had the requisite profit objective. We find this first factor to be important in our analysis and overall it strongly favors petitioner.

2.      Expertise of the Taxpayer and Her Advisors

A taxpayer's expertise, research, and study of the accepted practices in an industry, as well as her consultation with experts, may indicate a profit motive. Sec. 1.183-2(b)(2), Income Tax Regs. In cases involving artists, we have considered (among other things) the taxpayer's education, teaching activities, public recognition, and skills.

In Churchman, 68 T.C. at 702, we found that the taxpayer had the requisite expertise as an artist where she studied art for 2½ years, taught art at the college level, had her works shown in commercial galleries at least once a year, and was

[*35] the subject of articles and critical reviews in newspapers and magazines. In Waitzkin, 63 T.C.M. (CCH) at 2745, we found that the taxpayer had the requisite expertise as an artist where she devoted most of her time to producing artwork, promoted her art to collectors and museums, and sold art for many years through galleries and otherwise.

By these standards, there is no dispute that petitioner ranks at the top of the scale in terms of expertise as an artist. Indeed, respondent all but concedes this point. In his post-trial brief, respondent does not challenge petitioner's accomplishments in the field of art and acknowledges that she "has significant expertise as an artist."

Like most artists, petitioner did not retain professional business consultants. Rather, her principal "advisors" were the galleries that represented her. Throughout her career, petitioner was represented by five New York art galleries. These galleries exhibited her work; arranged openings and customer receptions; and marketed her work to collectors. The expertise of petitioner's advisors seems indisputable.

While conceding that petitioner and her advisors have the requisite artistic expertise, respondent contends that she lacks expertise in the economics of being an artist. But petitioner does not need an economics degree to know how to sell

[*36] art.  See Freed v. Commissioner, T.C. Memo. 2004-215, 88 T.C.M. (CCH) 288, 291 ("Petitioner does not need advanced training in economics to know that a thoroughbred horse that wins races is more valuable than one that does not."); sec. 1.183-2(c), Example (6), Income Tax Regs. (concluding that chemical researcher was engaged in a trade or business without addressing his expertise in the economics of the plastics industry).  Petitioner understood the general factors that affect the pricing of art--a history of sales, gallery representation, solo exhibits, critical reviews, and prestigious public accolades--and she worked diligently to achieve these credentials.  Petitioner is without doubt an expert artist who understands the economics of her business.  This factor strongly favors petitioner.

>   3.    Taxpayer's Time and Effort

The fact that a taxpayer devotes considerable time and effort to an activity may indicate a profit objective.  Giles v. Commissioner, T.C. Memo. 2006-15. Having another job does not necessarily detract from this conclusion--in section 183 cases, this is likely the rule rather than the exception--because a taxpayer may engage in more than one trade or business simultaneously.  See Gestrich v. Commissioner, 74 T.C. 525, 529 (1980), aff'd without published opinion, 681 F.2d 805 (3d Cir. 1982); Sherman v. Commissioner, 16 T.C. 332, 337 (1951).  In Churchman, 68 T.C. at 697, we noted that the taxpayer taught art classes at two

[*37] colleges and had "given numerous workshops independently of any institution." We regarded this as a positive factor in concluding that she was engaged in the trade or business of art. Id. at 702.

Petitioner devoted roughly 30 hours per week to her art business during the academic year and worked on her art full time during the summer. These facts compare favorably to those of other cases in which the taxpayer was found to be engaged in a trade or business. See, e.g., Sernett v. Commissioner, T.C. Memo. 2012-334, at *15-*17 ("time and effort" factor favored profit motive where taxpayer spent significant time traveling to racing events and preparing cars for those events, even though he enjoyed racing); Givens v. Commissioner, T.C. Memo. 1989-529, 58 T.C.M. (CCH) 255, 259 (taxpayer demonstrated requisite profit objective where he devoted two to four hours daily and more time on weekends to horse activity).

We have sometimes disregarded time spent on mundane tasks where such tasks (such as grooming horses) would be essential regardless of whether the activity was conducted as a hobby or a business. See, e.g., Giles v. Commissioner, T.C. Memo. 2006-15; Sullivan v. Commissioner, T.C. Memo. 1998-367, aff'd without published opinion, 202 F.3d 264 (5th Cir. 1999). Here, the mundane tasks that petitioner performed, such as marketing and networking with potential

[*38] collectors, were essential only because she was conducting a business. They would have been unnecessary if she were pursuing a hobby.

Petitioner's job as a professor, far from detracting from her activity as an artist, was synergistic with it. As a tenured professor at Hunter College, petitioner enjoyed academic prestige that enhanced her standing with art professionals, art critics, and museum curators. Her teaching position afforded her flexible hours and provided numerous opportunities for networking with important people in the New York art world. We conclude that petitioner devoted substantial time and effort to her art business and that this third factor strongly favors petitioner.

4.    Expectation of Appreciation in Value

An expectation that assets used in the activity will appreciate in value may indicate a profit motive. Sec. 1.183-2(b)(4), Income Tax Regs. Even if the taxpayer derives no profit from current operations, she may reasonably entertain an expectation of overall profit when asset appreciation is factored in. Ibid. The expectation of appreciation becomes less speculative when a taxpayer shows actual success in an endeavor that could plausibly lead to appreciation. Cf. Tinnell v. Commissioner, T.C. Memo. 2001-106; Hoyle v. Commissioner, T.C. Memo. 1994-592.

[*39] Respondent contends that petitioner has not shown that appreciation in the value of her artwork could ever exceed her accumulated claimed losses. This contention improperly focuses on actual rather than expected appreciation. See Strickland v. Commissioner, T.C. Memo. 2000-309, 80 T.C.M. (CCH) 451, 457; sec. 1.183-2(b)(4), Income Tax Regs. The relevant question is whether petitioner could reasonably entertain an expectation that the value of her inventory would eventually appreciate significantly. See, e.g., Upton v. Commissioner, T.C. Memo. 1990-250.

In Churchman, where the taxpayer had a "relatively large inventory" of artwork, we found that "[i]t is certainly conceivable * * * that she may someday sell enough of her paintings to enable her 'to recoup the losses * * * sustained in the intervening years.'" 68 T.C. at 703 (quoting Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), aff'd, 379 F.2d 252 (2d Cir. 1967)). In Waitzkin, 63 T.C.M. (CCH) at 2745, where the artist likewise had a large inventory, we found that she had the potential to "enjoy greater financial benefits from her work" as it gained recognition and that "at any moment, [she] might become even more commercially successful." Cf. Allen v. Commissioner, 72 T.C. 28, 36 (1979) (finding ski lodge to be a trade or business where lodge had appreciated in value and taxpayers reasonably expected the value of their assets to continue increasing).

[*40] Respondent's expert analyzed the prices of certain oil paintings in an effort to demonstrate that petitioner's works did not appreciate in value but rather stayed in a stable range between 1971 and 2013.  While Ms. von Habsburg is a well-qualified art professional, we find her method for determining the potential for asset appreciation to be unreliable as applied here.  We are not bound by the formulas and opinions proffered by an expert witness and will accept or reject expert testimony in the exercise of sound judgment.  See Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938); Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990).

Ms. von Habsburg bases her conclusion on the average sale prices of petitioner's oil paintings over the years.  However, she did not consider sales of the same painting at two distinct times, then determine the price change for that work.  Where an expert relies on comparable sales, it is necessary to determine whether the items compared, if not identical, are at least similar.  Cf. Chandler v. Commissioner, 142 T.C. __, __ (slip op. at 10) (May 14, 2014); Schmidt v. Commissioner, T.C. Memo. 2014-159, at *24.

Ms. von Habsburg focused exclusively on the prices paid for the paintings, with no consideration given to their size, quality or subject matter, or to the conditions prevailing in the art market at the times of sale.  Other things equal, it seems

[*41] obvious that a very large painting will sell for a higher price than a very small painting. Ms. von Habsburg did not view any of the works, and there is no indication that she analyzed any relevant data about the paintings except the sale prices. Because we find her methodology unreliable, we accord her appreciation analysis little weight.[5]

During 2004-2009 petitioner had an inventory of at least 1,500 pieces of art available for sale. She had an extensive exhibition record, numerous positive critical reviews, current or prior representation by five galleries, and multiple awards and accolades evidencing her public recognition. At least 25 museums had acquired her works, as well as dozens of major corporations and government institutions. She had a long history of sales with proceeds approaching $1,200,000. She earned income of almost $112,000 from sale of art in 1995, and she could plausibly expect that such good years would recur.

The testimony established that it is difficult to predict when success will occur in the art world, but that the prices paid for works by established artists often increase dramatically toward the end of their careers. All in all, we find that

---

[5]Petitioner argues that examination of her sale prices confirms that her art did appreciate. She provides one example: in the 1970s, a 14 by 14-inch oil painting sold for $325; in 2001, a 15 by 15-inch oil painting sold for $3,000, a nine-fold increase. Petitioner's analysis, apart from its selective nature, suffers from some of the same flaws as Ms. von Habsburg's analysis.

[*42] petitioner entertained a reasonable expectation that her artwork, over the course of her career, would appreciate significantly in value, and that this expectation explains her "willingness to continue to sustain operating losses." Allen v. Commissioner, 72 T.C. at 36.  We conclude that this fourth factor favors petitioner, albeit less strongly than the previous three factors.

     5.     Taxpayer's Success in Other Activities

A track record of success in other business ventures may indicate that the taxpayer has the entrepreneurial skills and determination to succeed in subsequent endeavors.  This in turn may imply that the taxpayer, when embarking on these endeavors, does so with the expectation of making a profit.  Sec. 1.183-2(b)(5), Income Tax Regs.  On the other hand, the absence of prior business experience creates no inference that the taxpayer lacks a profit motive when undertaking a new venture.  See Arwood v. Commissioner, T.C. Memo. 1993-352.

In a typical section 183 case, the taxpayer achieves considerable success in a business activity and later embarks on a new activity that the IRS regards as a hobby or sport.  Here the sequence is reversed.  Petitioner embarked on the challenged activity (as an artist) a decade before she secured her salaried position (as a professor).  And she practiced as an artist for 25 years before becoming a full professor in 1996.

[*43] Petitioner has plainly been successful in her academic career. She rose through the ranks at Hunter College from visiting assistant professor to tenured member of the faculty. Obtaining a studio art teaching position at Hunter College is extremely competitive, and her steady upward path shows that she had the skills, determination, and personal qualities that might also benefit her career as an artist. Because she commenced her career as an artist many years before she started teaching, her success in the latter is not exactly a "leading indicator" of success in the former. But the academic success and prestige she gained in the late 1990s may have contributed to her belief that her prospects as an artist could flourish during the next decade. Cf. Daugherty v. Commissioner, T.C. Memo. 1983-188, 45 T.C.M. (CCH) 1224, 1228 ("Petitioner has shown diligence, initiative, foresight, and other qualities that generally lead to success in other business activities, and he had reason to expect eventual success with this one."). Although we find this factor to have limited relevance here, to the extent it has relevance, it favors petitioner.

6. History of Income or Losses

The fact that a taxpayer incurs a series of losses beyond an activity's startup years may imply the absence of a profit objective. Sec. 1.183-2(b)(6), Income Tax Regs. This inference may not arise where losses are due to "customary business

**[\*44]** risks or reverses" or to "unforeseen or fortuitous circumstances which are beyond the control of the taxpayer." Ibid. This inference may also be weaker in some fields of activity than in others. As we early recognized: "If losses, or even repeated losses, were the only criterion by which farming is to be judged a business, then a large proportion of the farmers of the country would be outside the pale. It is the expectation of gain, and not gain itself which is one of the factors which enter into the determination of the question." Riker v. Commissioner, 6 B.T.A. 890, 893 (1927).

Because it often takes many years to achieve economic success in the creative arts, we have found that "a history of losses is less persuasive in the art field than it might be in other fields." Churchman, 68 T.C. at 701-702. In Waitzkin, 63 T.C.M. (CCH) at 2745, the taxpayer was a "nationally recognized artist whose work ha[d] been shown and exhibited in many well-known galleries and famous museums." We held that she was engaged in the trade or business of art even though she had never made a profit. Discounting her "history of losses," ibid., we explained:

> It is well recognized that profits may not be immediately forthcoming
> in the creative art field. Examples are legion of the increase in value
> of a painter's works or a sculptor's works after he or she receives
> public acclaim. Many artists have to struggle throughout their careers.

**[\*45]** This does not mean that serious artists do not intend to profit from their activities. It only means that their lot is a difficult one.

Petitioner has reported substantial losses for Federal income tax purposes in at least 18 of the last 20 years. She realized a significant profit from sales of art in 1995 and (apparently) a smaller profit in 2013. But the Court is convinced that the magnitude of these reported losses is explained in large part by her practice of claiming on her Schedule C deductions for many expenses that were actually personal in nature. But for this, she would have reported significantly smaller losses for all years and quite possibly additional profits for some.

For creative artists, the line between business and personal expenses may sometimes seem hard to discern. Petitioner is not alone in resolving doubts in favor of deductibility. For example, in Hughes v. Commissioner, T.C. Memo. 1995-202, 69 T.C.M. (CCH) 2562, 2564, we held that a photographic artist was engaged in a trade or business despite seven years of continuous losses. "[T]he magnitude of the reported losses," we explained, "appears to have resulted from petitioner's overly liberal view of what constitutes a business (vis-a-vis personal) expense, rather than the lack of a profit motive." Ibid. In Richards v. Commissioner, T.C. Memo. 1999-163, 77 T.C.M. (CCH) 2006, 2010, we held that a writer of screenplays was engaged in a trade or business despite five years of

[*46] substantial losses.  The persistence of these losses, we concluded, was not attributable to the absence of a profit motive, but rather to "the precarious nature of the entertainment business" and "the claiming of expenses not properly allocable to the writing activity."  Ibid.

The core expenses of petitioner's art business do not seem wildly out of line with the levels of income she has historically generated from sale of her art.  While we do not now decide which expenses are allowable as deductions,  it is clear that many expenses she claimed were personal.  Her overclaiming of deductions on her tax returns does not show that she lacked an intent to derive an economic profit from selling art.[6]

Petitioner urges that the Court should factor in the depressed art market during the years at issue.  The regulations recognize that if losses are caused by "unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such as * * * depressed market conditions, such losses would not be an indication that the activity is not engaged in for profit."  Sec. 1.183-2(b)(6), Income Tax

---

[6]Respondent errs in citing Portland Golf Club v. Commissioner, 497 U.S. 154 (1990), for the proposition that we must take petitioner's reported Schedule C losses at face value when determining whether she had a profit motive.  That case stands only for the proposition that the method of accounting used on the taxpayer's returns should also be employed in the profit-motive analysis.  See id. at 169-170.

[*47] Regs.; see Engdahl, 72 T.C. at 669 (finding profit motive where taxpayers' losses were due in part to a market shift that disfavored their products).

Petitioner's expert, Mr. Danese, observed that the 2008-2010 financial crisis had a "huge impact" on the New York art market, causing galleries to close (including Michael Steinberg Fine Art, which represented petitioner) and causing many artists to experience depressed sales. The financial crisis surely helps explain why petitioner sold no art at all during 2008 and very little during 2009. However, it does not explain away the losses that she incurred between 1996 and 2007.

Overall, this sixth factor weighs in respondent's favor because petitioner has had many years of economic and tax losses. But no one factor is determinative of a taxpayer's profit motive. See Engdahl, 72 T.C. at 666; cf. Stasewich v. Commissioner, T.C. Memo. 2001-30 (finding no profit motive where artist had limited expertise, sales, and public recognition). In light of our discussion above, we are convinced that these losses do not negate petitioner's actual and honest intent to profit from sale of her art.

7.    Amount of Occasional Profits

The fact that a taxpayer derives some profits from an otherwise money-losing venture may support the existence of a profit motive. See sec. 1.183-

**[*48]** 2(b)(7), Income Tax Regs. Moreover, "an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated." Ibid. The regulations cite a wildcat oil drilling venture as an example of an activity in which an honest profit motive may be founded on "a small chance that * * * [the taxpayer] will make a large profit." Sec. 1.183-2(c), Example (5), Income Tax Regs.[7] In evaluating the facts, we may consider evidence from years subsequent to the period at issue. See Smith v. Commissioner, T.C. Memo. 1993-140 (actual profits in subsequent years have probative though not determinative significance).

Petitioner has earned income of approximately $667,902 from sales of 356 works of art between 1971 and 2013. She reported a Schedule C profit of $34,204 in 1995, and she appeared to be on track for another profitable year in 2013, when she earned at least $75,000 from sales of her art. The evidence established that success in the art world is very hard to predict and that a single event--a solo show, a rave review, or a museum acquisition--can lead, fairly suddenly, to an

---

[7] See, e.g., Dawson v. Commissioner, T.C. Memo. 1996-417 (taxpayer's belief that champion horse could generate substantial profits may support profit objective); Dwyer v. Commissioner, T.C. Memo. 1991-123 (sponsorship expenses of NASCAR racing were reasonable given potential prize money).

[*49] exponential increase in the prices paid for an artist's work. While making art has little in common with drilling wildcat wells, they are both speculative ventures in which the taxpayer can hope to realize a very large return from a relatively small investment. Given that petitioner has had only two years of profits, we find that this factor weighs in respondent's favor, but not terribly heavily.

8.    Taxpayer's Financial Status

The fact that a taxpayer lacks substantial income or capital from sources other than the activity may indicate that she engages in the activity for profit. Sec. 1.183-2(b)(8), Income Tax Regs. An activity that produces losses, if recognized as a trade or business, will normally generate tax benefits for a taxpayer with other income. The receipt of such tax benefits, standing alone, does not establish that the taxpayer lacks a profit motive for the activity. See Engdahl, 72 T.C. at 670; McKeever v. Commissioner, T.C. Memo. 2000-288.

Petitioner earned a salary from her position at Hunter College and derived relatively modest income from investments. Cf. sec. 1.183-2(c), Example (2), Income Tax Regs. (wealthy individual with "very sizable income from securities" did not have a profit motive in lecturing about philosophy). She was a practicing artist for over a decade before she began teaching at Hunter College. We find that

[*50] petitioner's art business was her primary activity; she did not become an artist in order to shield her other income from taxes. We conclude that this factor is neutral, favoring neither party's position.

9.      Elements of Personal Pleasure

The fact that a taxpayer derives personal pleasure from an activity, or finds it recreational, may suggest that she engages in it for reasons other than making a profit. Sec. 1.183-2(b)(9), Income Tax Regs. The derivation of personal pleasure, however, "is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged in for profit as evidenced by other factors." Ibid. "Success in business is largely obtained by pleasurable interest therein." Wilson v. Eisner, 282 F. 38, 42 (2d Cir.1922). Thus, "a business will not be turned into a hobby merely because the owner finds it pleasurable; suffering has never been made a prerequisite to deductibility." Jackson v. Commissioner, 59 T.C. 312, 317 (1972); Giles v. Commissioner, T.C. Memo. 2006-15.

In Churchman, 68 T.C. at 702, the Court acknowledged that the taxpayer's art activities "involved recreational and personal elements." We nevertheless concluded that she conducted this activity with the intent to make a profit, noting that "her work did not stop at the creative stage but went into the marketing phase of the art business where the recreational element is minimal." Ibid. These less

[*51] pleasurable activities included maintaining a mailing list, sending out announcements, seeking representation from galleries, keeping receipts of business expenses, and maintaining records of sales and customers. Ibid.

It is obvious that petitioner derives pleasure from making art. But she credibly testified that making art, like writing a book or composing a symphony, also involves hard work. Many of her projects involved extensive research, ranging from details of Giotto's paintings in Assisi to confinement conditions in Guantanamo Bay. In connection with her "Abu Ghraib" series, petitioner interviewed numerous journalists who had reported from the war zone. In connection with her "Fires of War" series, she traveled to Kuwait and accompanied firefighters to burning oil fields. Few people find this sort of research pleasurable.

Like the taxpayer in Churchman, petitioner also devoted many hours to the mundane aspects of marketing her art and running her business. She maintained a mailing list of 3,000 collectors; mailed out slides and marketing packets; managed relationships with galleries; maintained sales records and moved them to a digital format; kept invoices, receipts, and other business records; and attended networking events with museum curators and potential collectors. With respect to these activities, we believe that for petitioner, as for the taxpayer in Churchman, "the recreational element * * * [was] minimal." 68 T.C. at 702.

[*52] We find that petitioner's enjoyment of her art activity--at least some of its aspects--is not sufficient to cause it to be classified as a hobby rather than a business. Petitioner devotes to her art activity a level of seriousness that takes it well beyond the realm of "recreation." On balance, we regard this ninth factor as neutral or as slightly favoring petitioner.

IV.  Conclusion

We find that the first, second, third, and fourth factors set forth in section 1.183-2(b), Income Tax Regs., strongly support the conclusion that petitioner engaged in her art activity with an actual and honest expectation of profiting from it. We conclude that the fifth, eighth, and ninth factors slightly favor petitioner or are neutral. Only the sixth and seventh factors, focusing on losses and occasional profits, favor respondent, but they favor him less strongly in these cases than in many section 183 cases. In a qualitative as well as a quantitative sense, we conclude that the balance of factors favors petitioner and that she has met her burden of proving that in carrying on her activity as an artist, she had an actual and honest objective of making a profit. We therefore hold that she was, within the meaning of section 162(a), engaged during the years in issue in the "trade or business" of being an artist.

**[*53]** On the basis of the foregoing,

An appropriate order will be

issued.